**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

THE FOUNDATION FOR GOVERNMENT
ACCOUNTABILITY,

*Plaintiff,*

v.

U.S. DEPARTMENT OF JUSTICE,

*Defendant.*

Case No. 2:22-cv-00252-JLB-KCD

**ORAL HEARING REQUESTED**

**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND,
ALTERNATIVELY, FOR *IN CAMERA* INSPECTION AND LIMITED
DISCOVERY AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Plaintiff FGA cross-moves for summary judgment and responds in opposition to Defendant DOJ's motion for summary judgment. The Court should order DOJ to produce its "Strategic Plan for the Implementation of Executive Order 14019" ("Final Implementation Plan") and other documents that it is unlawfully withholding.

More than a year ago, FGA submitted FOIA requests to uncover the federal government's (and potentially, various third-party ideological organizations') unprecedented interference with election administration. Through Executive Order 14019, President Biden ordered *all* federal agencies to develop strategic plans to do just that. *See* 86 Fed. Reg. 13623 (June 21, 2021).

DOJ's Final Implementation Plan is currently in place and governing DOJ's day-to-day operations. Although EO 14019 ordered DOJ to adopt election-related policies, *and* DOJ publicly touts its implementation, *and* another agency (Department of Defense) apparently had no problem with making its strategic plan publicly

available, DOJ is erroneously asserting executive privileges under Exemption 5 and unlawfully withholding the Final Implementation Plan and other public records.

FGA sought the release of the Plan and other records to inform the public about DOJ's election-related activities in advance of the 2022 midterm elections. *See* Case Mgmt. Report 9 (Doc. 24). Although Magistrate Judge Dudek ordered DOJ to finally stop its year-long delay and produce the documents by early September, DOJ is still erroneously hiding the Final Implementation Plan under Exemption 5—guaranteeing that FGA and the public will not see the Plan until well after the midterm elections. These delay and secrecy tactics are "repugnant" to FOIA and our open and transparent scheme of government. *Fla. House of Representatives v. U.S. Dep't of Com.*, 961 F.2d 941, 945 n.4 (11th Cir. 1992).

FGA is entitled to summary judgment for multiple reasons.

***First***, the "secret law" doctrine categorically bars agencies from invoking Exemption 5 over documents that constitute "effective law and policy." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975). The Final Implementation Plan is undoubtedly DOJ's "formal … policy on how it carries out its responsibilities" under EO 14019. *Public Citizen, Inc. v. OMB*, 598 F.3d 865, 875 (D.C. Cir. 2010). All of this is apparent from the face of EO 14019, the Plan's name itself, DOJ's own website, and contemporaneous communications between DOJ and White House advisors.

***Second***, even if Exemption 5 is not categorically precluded, DOJ's invocation of the presidential communications privilege over the Plan is entirely improper. Because this privilege is "specific to the President," *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108,

1114 (D.C. Cir. 2004), DOJ's trial counsel cannot unilaterally call on this "rarely" "invoked" privilege, *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997); *see also United States v. Aaron Burr*, 25 F. Cas. 187, 192 (C.C. Va. 1807). Even if DOJ's trial counsel could do so, DOJ failed to show that *DOJ*'s Final Implementation Plan—which simply carries out EO 14019's mandates—"reflect[s] *presidential* decisionmaking and deliberations." *Trump v. Thompson*, 20 F.4th 10, 25 (D.C. Cir. 2021) (emphasis added). Moreover, the Plan was not "limited" to any "advisory purposes" and was widely circulated "beyond the President's closest advisors." *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 26 (D.D.C. 2013).

*Third*, DOJ's invocation of the deliberative process privilege over the Plan and various other documents is similarly unavailing. The Final Implementation Plan is plainly a *post*-decisional document. DOJ's notes summarizing its meeting with third-party ideological organizations are purely factual and cannot be withheld. And as for these and other documents, DOJ was required to segregate and produce purely factual content. For these reasons, the Court should grant summary judgment in FGA's favor.

*Alternatively,* if the Court is unable to resolve the cross motions in FGA's favor, it should at a minimum order DOJ to produce the withheld documents for *in camera* inspection and allow for limited discovery to resolve any outstanding fact issues.

## FGA'S STATEMENT OF MATERIAL FACTS

**A.    President Biden's unprecedented interference with the states' administration of elections**

1.      "Confidence in the integrity of our electoral processes" is "essential to the functioning" of our Republic. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

2.      Administering fair and transparent elections is an "extraordinarily complicated" and "difficult" task, *Merrill v. Milligan*, 142 S.Ct. 879, 880 (2022) (Kavanaugh, J., concurring)—nonetheless, a duty that the states are tasked to discharge under the Constitution. *See, e.g.*, U.S. Const. art I, §4.

3.      The Constitution does not envision a role for the President in administering elections; this division of responsibilities makes sense because state-run elections are a critical check on the federal government. *Cf.* The Federalist No. 45, 287-88 (J. Madison) (Rossiter ed. 1961) ("[T]he State governments will in no instance be indebted for their appointment to the direct agency of the federal government, and very little, if at all, to the local influence of its members.").

4.      On March 7, 2021, President Biden signed EO 14019, 86 Fed. Reg. 13623, declaring that it was "the responsibility of the Federal Government to expand access to … voter registration and election information." EO 14019, §2.

5.      The Order further required all federal agencies to submit to the Assistant to the President for Domestic Policy, within 200 days of the order, a strategic plan detailing how the agency will help increase voter registration and voter participation. EO 14019, §3(b).

6.     The Order required agencies to consider concededly "controversial" measures, Mot. 23 (Doc. 50), designed to turn federal agencies into voter registration agencies—such as facilitating "approved" third-party organizations to provide voter registration services on agency premises, providing access to vote-by-mail ballot applications, and agreeing to take over states' duties as a National Voter Registration Act agency, EO 14019, §§3, 4.

7.     Many members of Congress found it "most troubling" that the Order was "nearly identical to a federal election takeover plan crafted by the radical left-leaning group known as Demos," which also called for the weaponization of the DOJ … in the ways of attempt to federalize elections." Letter from Rep. Ted. Budd et al. to Shalnda Young, Acting Director, OMB, at 1 (Jan. 19, 2022), bit.ly/3fjAK8K.

8.     The Attorneys General from 13 states also voiced their concerns, especially about the negative effects of "injecting [third-party organizations] into the election process" on the states' "interest of free and fair elections." Letter from Jeff Landry, Louisiana Attorney General et al. to Joseph R. Biden, President (September 28, 2022), bit.ly/3TN68LV.

**B.   FGA's FOIA requests, DOJ's unlawful delay, and this lawsuit.**

9.     On July 30, 2021, FGA sought DOJ's strategic plan (Request 1) and all communications with the White House related to EO 14019 and/or the strategic plan

(Request 4).[1] Compl. ¶17 (Doc. 1).

10.     After nearly a year of delay—and eight months after the FOIA statutory deadline for making determinations and promptly producing these records had passed—on April 20, 2022, FGA commenced this action to compel DOJ's compliance with FOIA. *See* Compl. ¶¶22-30; *CREW v. FEC*, 711 F.3d 180, 188-89 (D.C. Cir. 2013).

11.     Despite having discovered only a modest number of potentially responsive records, and despite the straightforward nature of FGA's requests, DOJ maintained at the Case Management Conference that it could not make any productions until 2023—*nearly two years* after the submission of FGA's requests. *See* Case Mgmt. Report 10.

12.     FGA stressed that because "EO14019 concerns the integrity of our elections[,] … FGA need[ed] the documents … no later than September to meaningfully make use of the documents … *prior to the 2022 elections.*" *Id.* at 9.

13.     Magistrate Judge Dudek rejected DOJ's request for further delays in violation of FOIA and ordered DOJ to produce all non-exempt documents by September 8, 2022. Scheduling Order 2 (Doc. 31); Am. Schedule Order 1 (Doc. 37).

**C.   DOJ's erroneous assertion of Exemption 5.**

14.     On September 8, 2022, DOJ produced 135 pages of heavily redacted records in response to Request 4 and withheld the Final Implementation Plan in full.

---

[1] FGA also requested documents relating to DOJ's agreement to serve as an NVRA agency and communications with an outside group, Demos. Compl. ¶17. DOJ did not make available its search methods to FGA until it filed its summary judgment briefings. *See* Joint Status Report ¶5 (Doc. 49). Having reviewed DOJ's search methods, FGA does not challenge the adequacy of the search.

Ex. 3 to Kagle Decl., at 2. (Doc. 50-2).

15.   DOJ's assertion of Exemption 5 is inconsistent with undisputed record evidence. *See, e.g.*, *See* Excerpt of DOJ's Production (Ex. A); Template for Interim Strategic Plans (Ex. B); Listening Session Notes (Ex. C).

16.   Soon after President Biden signed EO 14019, the White House "convene[d] an Interagency Policy Committee (IPC) ... to kick-off [the] collective work to implement the EO." Ex. A, at 9.

17.   A White House employee (Devontae Freeland) commended various agencies' "efforts so far in planning implementation of the President's Executive Order," noting how "ambitious and creative" were the "ideas that agencies across the government have already begun to develop in order to advance the EO's mandate to expand access to voter registration and political participation." *Id.* at 13.

18.   Freeland reiterated that "[t]he purpose of [the interagency committee] meeting will be to ... share strategies for implementing a whole-of-government presidential priority." *Id.*

19.   Soon after the agencies began developing their plans to comply with EO 14019's 200-day submission deadline, the White House required that agencies submit an interim report by June 15, 2021 and shared a template for the interim report. *Id.*; Ex. B, at 2.

20.   The interim report template previews the content of the Final Implementation Plan, which shows various policy determinations by DOJ. *See id.*

21.     DOJ's implementation of EO 14019 requires the participation of, at least, the Office of the Deputy Attorney General, the Office of Assistant Attorney General, the Civil Rights Division, the Bureau of Prisons, the U.S. Marshals Service, and the Probation and Pretrial Service Office. Brinkmann Decl. ¶9 (Doc. 50-4); EO 14019, §9.

22.     DOJ participated in, and took notes from, a "listening session" with third-party ideological organizations on July 12, 2021. *See* Ex. C, at 1-13.

23.     DOJ's website explains that DOJ's components like the Bureau of Prisons and the U.S. Marshals Service—in consultation with the Civil Rights Division—"will continue to promote and expand voting among eligible voters in federal custody pursuant to Executive Order (EO) 14019." DOJ, *DOJ Strategic Plan – Strategic Goal 3: Protect Civil Rights* (last visited Nov. 3, 2022), www.justice.gov/doj/doj-strategic-plan/objective-31-protect-right-vote.

**RESPONSE TO DOJ'S STATEMENT OF MATERIAL FACTS**

1.–13. Admitted.

14.     FGA disputes that Exemption 5 applies. *See* Exs. A-C.

**SUMMARY JUDGMENT STANDARD**

In assessing whether the movant (DOJ) has met its burden, a court "'must view the evidence in the light most favorable to the nonmoving party [(FGA)]'" and "'draw all reasonable inferences in [its] favor.'" *Proj. for Priv. & Surveillance Accountability, Inc. v. DOJ*, 2022 WL 4547531, at *3 (D.D.C. Sep. 29, 2022). "'This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately [has] the onus of proving that the [documents] are exempt

from disclosure.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017). "'Summary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption.'" *Knight First Am. Inst. v. CDC*, 560 F. Supp. 3d 810, 820 (S.D.N.Y. 2021).

## ARGUMENT

### I.   DOJ failed to show that Exemption 5 applies.

FOIA codified "'a strong public policy in favor of public access to information in the possession of federal agencies." *News-Press v. DHS*, 489 F.3d 1173, 1190 (11th Cir. 2007). All "responsive documents 'are presumed to be subject to disclosure unless [the agency] affirmatively establishes that the requested records fall into one of [the] exemptions.'" *Broward Bulldog, Inc. v. DOJ*, 939 F.3d 1164, 1175 (11th Cir. 2019). These exemptions are "'explicitly made exclusive,' and must be 'narrowly construed.'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). "All doubts as to the applicability of an exemption must be resolved in favor of disclosure." *Knight*, 560 F. Supp. 3d at 819.

FOIA's Exemption 5 applies only to "inter-agency … memorandums … that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. §552(b)(5). "To qualify [for Exemption 5], a document … must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

DOJ's invocation of Exemption 5 over the Plan and various documents fails for three reasons. ***First***, the secret law doctrine categorically bars Exemption 5 because

DOJ's Final Implementation Plan amounts to effective law and policy. *Second*, even if Exemption 5 is not precluded, DOJ failed to show the presidential communications privilege applies to the Plan. *Third*, DOJ also failed to show that the deliberative process privilege applies to the Plan and various documents.

### A. The secret law doctrine bars the invocation of Exemption 5 for the Final Implementation Plan because the Plan constitutes DOJ's effective law and policy.

Under the "secret law" doctrine, agencies cannot invoke Exemption 5 over documents that amount to "'effective law and policy.'" *Sears*, 421 U.S. at 153. FOIA requires that agencies affirmatively—even without any requests—"make available to the public," among others, "final opinions" and "statements of policy and interpretations which have been adopted by the agency." 5 U.S.C. §552(a)(2)(A), (B). The Supreme Court was "reluctant … to construe Exemption 5 to apply to [these] documents" because these documents "represent[ ] a strong congressional aversion to 'secret (agency) law.'" *Sears*, 421 U.S. at 153. The Court held that "Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy." *Id.* "Exemption 5 ceases to apply" under the secret law doctrine. *N.Y. Times Co. v. DOJ*, 939 F.3d 479, 491 (2d Cir. 2019); *see also Wisdom v. U.S. Trustee Program*, 232 F. Supp. 3d 97, 120 (D.D.C. 2017) ("an agency may not cast records as predecisional when they actually convey what the agency's policymakers have decided"); *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 30 ("the[ ] same hortatory principles have relevance to the presidential communications

privilege"); *Aug v. Nat'l R.R. Passenger Corp.*, 425 F. Supp. 946, 950-51 (D.D.C. 1976) ("[F]inal policy determination[ ] … must be made available to the public.").

To determine whether a document constitutes "effective law and policy," courts focus on "the function and significance of the document in the agency's decisionmaking process." *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 678 (D.C. Cir. 1981). A document is not protected by Exemption 5 if it "reflects [the agency's] formal or informal policy on how it carries out its responsibilities." *Public Citizen*, 598 F.3d at 875. An agency document that is "routinely used by agency staff as guidance in conducting their [duties]" and "intended to have effect upon actions of others in the agency" constitutes effective law and policy. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 869 (D.C. Cir. 1980).

The Final Implementation Plan is a secret law over which DOJ cannot invoke Exemption 5 because it is undoubtedly DOJ's "formal … policy on how it carries out its responsibilities" under EO 14019. *Public Citizen*, 598 F.3d at 875. This is obvious from (1) the face of EO 14019, (2) the Plan's name itself, (3) DOJ's own website, and (4) contemporaneous communications between DOJ and White House advisors.

***EO 14019.*** The Final Implementation Plan is DOJ's effective law and policy because President Biden ordered DOJ to develop such a policy to expand DOJ's role in voter registration. President Biden declared that it "is the policy of [his] Administration" and "the responsibility of the Federal Government to expand access to … voter registration." EO 14019, §2. He ordered all federal agencies, including DOJ, to develop "a strategic plan outlining the ways … that the agency can promote

voter registration and voter participation." EO 14019, §3. DOJ cannot dispute that it created the Plan to implement the President's directives. The Final Implementation Plan therefore is an "agency 'statement[ ] of policy' that is presumptively subject to disclosure under FOIA." *Ctr. for Effective Gov't*, 7 F. Supp. at 30.

**The Plan's title.** The title of the Plan—"Strategic Plan for the Implementation of Executive Order 14019"—also says it all. Vaughn Index 21 (Doc. 50-3); *see Public Citizen*, 598 F.3d at 871 (title is relevant). DOJ concedes that the Final Implementation Plan was created "for implementing Executive Order 14019." Doc. 50-3, at 22.

**DOJ's website.** DOJ's own website further undercuts DOJ's claim of Exemption 5. It confirms that the Plan is effective law and policy "guiding" how DOJ is "conducting [its duties]" under EO 14019. *Coastal States Gas Corp.*, 617 F.2d at 869. The website states that DOJ's components like the Bureau of Prisons and the U.S. Marshals Service—in consultation with the Civil Rights Division—"will continue to promote and expand voting among eligible voters in federal custody pursuant to Executive Order (EO) 14019." DOJ, *DOJ Strategic Plan*, *supra* [2] As EO 14019 requires, DOJ notes that it is taking actions regarding "voter registration and the National Voter Registration Act" designations. *Id.* To the extent that it is publicly touting its implementation of EO 14019, there is no reason why DOJ can't release the full Plan. Indeed, unlike DOJ, the Department of Defense appears to have made publicly available its strategic plan that it "adjusted" "[i]n response to Executive Order 14019."

---

[2] Government websites are subject to judicial notice. *See, e.g.*, Fed. R. Evid. 201(b); *In re Cole v. Patton*, 2019 WL 3413525, at *2 (M.D. Fla. July 29, 2019).

DOD, *Federal Voting Assistance Program Strategic Plan 2021-2025* 2 (last visited Nov. 3, 2022), bit.ly/3DHsed1.

*Contemporaneous communications.* The contemporaneous communications prior to DOJ's submission of the Final Implementation Plan confirm that the Plan's "function and significance" was to implement EO 14019, thereby instituting DOJ's effective law and policy regarding voter registrations and election administration. *Taxation With Representation Fund*, 646 F.2d at 678.

For instance, a White House employee (Stephonn Alcorn) "convene[d] an Interagency Policy Committee (IPC) ... to kick-off [the] collective work to implement the EO." Ex. A, at 9. Another White House employee (Freeland) commended various agencies' "efforts so far in planning implementation of the President's Executive Order," noting how "ambitious and creative" were the "ideas... develop[ed] in order to advance the EO's mandate to expand access to voter registration and political participation." *Id.* at 13. Freeland reiterated that "[t]he purpose of [the interagency committee] meeting will be to ... share strategies for implementing a whole-of-government presidential priority." *Id.*

Furthermore, the interim strategic plan template confirms that the Final Implementation Plan constitutes DOJ's effective law and policy on voter registration issues. Soon after the agencies began developing their plans to comply with EO 14019's 200-day submission deadline, the White House required that agencies submit an interim report by June 15, 2021 and shared a template for the interim report. *Id.* at 20. The interim report template previews the content of the Final Implementation

Plan: (1) identification of the agency's component, office, or personnel responsible for implementing the plan; (2) how the agency would link online voter registration information to the agency's webpages; (3) how the agency would engage with the public offline to disseminate information about voter registration and participation; (4) how the agency would assist the public with voter registration and mail ballots; (5) how the agency would serve as the states' designated voter registration agency under the NVRA; (6) how the agency would ensure the identity documents that it issues complies with various state voter ID laws; and (7) how the agency would promote voter registration and participation among its employees. Ex. B, at 3-4.

There is no denying that the Plan constitutes DOJ's effective law and policy that must be disclosed. *See* 5 U.S.C. §552(a)(2)(A), (B); *Sears*, 421 U.S. at 153. For all of these reasons, the secret law doctrine categorically bars Exemption 5, and the Court accordingly does not need to reach whether the executive privileges apply to the Plan.

### B. Even if Exemption 5 is not precluded, DOJ failed to show that the presidential communications privilege applies to the Final Implementation Plan.

The presidential communications privilege "allows a President to protect from disclosure 'documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential.'" *Trump*, 20 F.4th at 25. This privilege is not limitless. Quite the opposite. Courts have counseled that this privilege should "be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected"—and no more. *In re Sealed Case*, 121 F.3d at 752.

DOJ failed to show that the presidential privilege applies for three reasons.

**First**, the presidential communications privilege has not been properly invoked because DOJ's trial counsel cannot unilaterally invoke that privilege. There is no indication in DOJ's filings that the President or anyone authorized by the President invoked the privilege over the Final Implementation Plan. This failure is fatal.

"The presidential communications privilege is specific to the President." *Judicial Watch*, 365 F.3d at 1114. It protects the "'documents or other materials that … *the President* believes should remain confidential.'" *Trump*, 20 F.4th at 25 (emphasis added). Courts have recognized "the dangers of 'expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President.'" *Judicial Watch*, 365 F.3d at 1116.

Since the early days of the Republic, courts have relied on the Presidents' and their authorized agents'—not trial counsel's—invocations of privilege. For instance, in Aaron Burr's misdemeanor trial following his acquittal from treason, Chief Justice Marshall held that the United States Attorney prosecuting the case could not "decid[e] what parts of the letters [sought by Burr from President Jefferson] ought to be … kept secret" and that "[t]he propriety of withholding [the letters] must be decided by [the President] himself, not by another for him." *Burr*, 25 F. Cas. at 192; *see also In re Sealed Case*, 121 F.3d at 738-39. In *United States v. Nixon*, President Nixon personally invoked the privilege. 418 U.S. 683, 686 (1974). And in *In re Sealed Case*, a seminal D.C. Circuit opinion on the presidential communications privilege, the White House Counsel who was "'specifically directed'" to invoke the privilege (not just the trial counsel)

submitted an affidavit invoking the privilege on behalf of the President. 121 F.3d at 744 n.16.

Here, there is no indication from DOJ filings that President Biden "believes" DOJ's Final Implementation Plan "should remain confidential." *Trump*, 20 F.4th at 25. There is only DOJ's trial counsel's post hoc assertion that the presidential communications privilege applies, *see* Mot. 10-13, and an affidavit from DOJ's Office of Information Policy (OIP) counsel remarking that "OIP"—not the President— "determined that the DOJ Strategic Plan falls …. within the presidential communications privilege," Brinkmann Decl. ¶16. All of this is woefully inadequate and does not amount to proper invocation of the privilege.

DOJ appears to be following a disputed practice of the D.C. federal district court that holds that, for FOIA cases, trial counsel can invoke the presidential communications privilege without any invocation from the President. *Compare Protect Democracy Proj., Inc. v. NSA*, 10 F.4th 879, 886 n.1 (D.C. Cir. 2021) ("'[T]he issue of whether a President must personally invoke the [presidential communications] privilege remains an open question.'")*, with Buzzfeed, Inc. v. FBI*, 2020 WL 2219246, at 13 (D.D.C. May 7, 2020) ("personal invocation … is not required in the context of FOIA's Exemption 5."). This practice, of course, is not binding on this Court.

Nor should this Court follow it. DOJ's approach contradicts binding precedent holding that to invoke FOIA Exemption 5, the agency must first meet the "judicial standards that would govern litigation." *Klamath*, 532 U.S. at 8. Under applicable judicial standards, the privilege applies only to the documents that "the President

believes should remain confidential." *Trump*, 20 F.4th at 25; *see also In re Sealed Case*, 121 F.3d at 38-39; *Burr*, 25 F. Cas. At 192; *cf. Texas v. Holder*, 2012 WL 13070060, at *2 (D.D.C. June 5, 2012) (three-judge panel) ("Texas must ensure that the legislator has, in fact, asserted the [legislative] privilege."). Trial counsel cannot unilaterally invoke the privilege without evidence showing that the President believes the document should remain confidential. Furthermore, here, DOJ already stated that it "consult[ed] ... the White House" regarding FGA's FOIA requests. Mot. 4; Kagle Decl. ¶35. If DOJ could consult about the nebulous "White House equities," *Id.* ¶34, it could have easily consulted about the presidential communications privilege. DOJ failed to do so, and this failure dooms DOJ trial counsel's invocation of the privilege.

**Second**, DOJ failed to show that the Final Implementation Plan, which DOJ created to implement EO 14019, reflects *presidential* decisionmaking and deliberations. The presidential communications privilege applies to "'documents or other materials that reflect presidential decisionmaking and deliberations.'" *Trump*, 20 F.4th at 25. "[N]o court has suggested that the mere fact [of] a President's direct involvement in a communication, either as an author or recipient, renders it automatically protected." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 28. Nor has any court suggested that the mere fact that a President's advisors were involved renders a communication automatically protected. *See id.*; *see also ACLU v. Dep't of Jus.*, 2016 WL 889739, at *5 (S.D.N.Y. Mar. 4, 2016) ("reject[ing]" the notion that the privilege attaches to "every communication that originates with or at the request of the President or one of his closest advisors"). "[T]he privilege has always been limited to certain types of communications directly

involving the President, specifically those communications ... made in the process of shaping policies and making decisions." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 28 (cleaned up); *see also Judicial Watch*, 365 F.3d at 1115 (focusing on protecting the President's and his advisors' freedom "to explore alternatives in the process of shaping policies and making decisions").

DOJ cannot invoke the presidential communications privilege over its Final Implementation Plan because it does not "reflect presidential decisionmaking and deliberations." *Trump*, 20 F.4th at 25. President Biden made his decision when he issued EO 14019 and ordered all federal agencies to develop strategic plans to increase voter registration and participation. Again, relevant evidence shows that DOJ created the Plan to implement EO 14019 and "identify ... the ways ... that *the agency* can promote voter registration and voter participation." EO 14019, §3(b) (emphasis added); *supra* 12-14. The Vaughn Index (Doc. 50-3, at 22) itself belies any suggestion that the final plan was for the President. Instead, it was *DOJ*'s plan for "implementing Executive 14019," and all DOJ could suggest was that it included "*DOJ* deliberations regarding potential future actions." DOJ's implementation of the President's order is not "part of the President's personal decision-making process such that [its] exclusion from the scope of the privilege would impair the quality of his deliberations." *Judicial Watch*, 365 F.3d at 1118; *cf. Ctr. for Effective Gov't*, 7 F. Supp. 3d at 30. Nor would DOJ's implementation reflect President Biden's decisionmaking. *See Trump*, 20 F.4th at 25.

DOJ asserts that the privilege applies because DOJ had to submit the Final Implementation Plan to Susan Rice, the President's domestic policy advisor. Mot. 11-

12. However, that a communication merely involves—or that it was merely solicited and received by—the President or his advisors alone is legally insufficient. *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 28; *ACLU*, 2016 WL 889739, at *5. If this were the case, the President could "engage in what is in effect governance by 'secret law,'" *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 29, by dictating that all agencies formulate wide-reaching (and potentially unlawful) policies *and* submit them to his advisors who would then later "brief[ ] … the President" the "compiled highlights" of the agencies' policies, Brinkmann Decl. ¶7. This would turn FOIA, a disclosure statute, into a withholding statute.

**Third**, even assuming that the Final Implementation Plan had any advisory purposes, it has been widely distributed beyond those purposes. Courts have held that "the more extensively a presidential communication is distributed," "the privilege's purpose of promoting candor and confidentiality between the President and his closest advisors become more attenuated." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26; *accord Brennan Ctr. for Jus. v. Dep't of State*, 2019 WL 10984173, at *5 (S.D.N.Y. Mar. 29, 2019). "[I]f distribution is far broader, the purposes animating the privilege will not justify its application." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 29.

Here, DOJ contends that the Final Implementation Plan was advisory because it was submitted to Susan Rice to advise the President. *See* Mot. 11-12. But as shown above, there is contrary evidence that contradicts DOJ's assertions. *Supra* 12-14. The nature of EO 14019, the Plan's title, DOJ's website, and contemporaneous

communications between DOJ and the White House show that the Final Implementation Plan's purpose was to implement policy, not to advise the President. *Id.* DOJ's conclusory declarations are "not sufficient" to overcome the "'contradictory evidence in the record'" call those declarations "'into question.'" *Gatore v. DHS*, 327 F. Supp. 3d 76, 97-98 (D.D.C. 2018); *see also Muckrock, LLC v. CIA*, 300 F. Supp. 3d 108, 122 (D.D.C. 2018) (if "unrefuted evidence … demonstrates" that the agency's action "violates the FOIA," summary judgment to the requester is appropriate).

But even if the Plan initially had any advisory purposes, DOJ cannot rely on the presidential communications privilege because the Plan was widely distributed "beyond the President's closest advisors" for implementation. *Ctr. For Effective Gov't*, 7 F. Supp. 3d at 26; *Brennan Ctr.*, 2019 WL 10984173, at *5. DOJ's implementation of EO 14019 required the participation of, at least, the Office of the Deputy Attorney General, the Office of Assistant Attorney General, the Civil Rights Division, the Bureau of Prisons, the U.S. Marshals Service, and the Probation and Pretrial Service Office. Brinkmann Decl. ¶9; EO 14019, §9(b), (c); Ex. A, at 6. DOJ's "widespread dissemination" of the Final Implementation Plan vitiates the privilege. *Ctr. For Effective Gov't*, 7 F. Supp. 3d at 26; *see also Brennan Ctr.*, 2019 WL 10984173, at *5; *Knight First Am. Inst.*, 560 F. Supp. 3d at 839 (denying privilege when "documents were … distributed throughout the Executive Branch" and "for a non-advisory purpose").

**C.    DOJ failed to show that the deliberative process privilege applies to the Final Implementation Plan and other documents.**

To fall within the deliberative process privilege, a document must be both "predecisional" and "deliberative." *Broward Bulldog*, 939 F.3d at 1195. "To be predecisional, information must be 'prepared in order to assist an agency decision-maker in arriving at his decision.'" *Id.* And to be "deliberative," the materials must play "'a direct part of the deliberative process in that [they make] recommendations or express[ ] opinions on legal or policy  matters.'" *Id.* Purely factual matters are not protected by the deliberative process privilege, and the burden is still on the agency to show that "facts" and "opinions" are intertwined such that they cannot be reasonably segregated. *BuzzFeed, Inc. v. DOJ*, 419 F. Supp. 3d 69, 78-79 (D.D.C. 2019). DOJ's invocation of the deliberative process privilege fails.

***Final Implementation Plan.*** The Plan is a *post-decisional* document that is categorically outside the deliberative process privilege. It "reflects 'the consummation'" of DOJ's 200-day "decisionmaking process"—not "merely tentative" position—regarding how DOJ will implement President Biden's EO 14019. *U.S. Fish & Wildlife Serv. v. Sierra Club*, 141 S.Ct. 777, 786 (2021). DOJ's only argument appears to be that the Plan purportedly "'reflects the ongoing consultative process.'" Mot. 23. "[A]lthough [this document] may assist with future decision-making …, the policy itself and management's expectations concerning its application have already been determined." *Freedom of Press Found. v. DOJ*, 493 F. Supp. 3d 251, 262 (S.D.N.Y. 2020). And even if the Plan included certain deliberative portions, DOJ should have

21

segregated and released the non-exemption portions. DOJ (at 24) only briefly offers a conclusory justification for its failure to segregate.

*Notes from meeting with third-party organizations.* DOJ initially withheld this 12-page document in its entirety but then later released a heavily redacted version. *See* Ex. C, at 1-13. This document constitutes notes taken from DOJ's meeting with left-wing third-party advocacy organizations. "To the extent that such notes merely record or summarize factual content of the meetings …, those purely factual portions must be disclosed 'unless the material is so inextricably intertwined with the deliberative sections of documents….'" *Nat'l Whistleblower Ctr. v. HHS*, 849 F. Supp. 2d 13, 38 (D.D.C. 2012). Courts consider "statements made" by meeting participants to be "'merely factual material'" that "'do not fall within the deliberative process privilege.'" *Id.* (quoting *Williams & Connolly LLP v. SEC*, 729 F. Supp. 2d 202, 213 (D.D.C. 2010)). DOJ primarily relies on *Electronic Privacy Information Center v. DOJ*, but that case is inapposite because it involved "research and briefing materials" containing "opinions and analysis." 320 F. Supp. 3d 110, 118-19 (D.D.C. 2018). DOJ's notes here, however, should be released. Even if the notes contained certain deliberative materials, DOJ failed to carry its burden to show that the purely factual information could not be segregated and released.

*"Tick Tock" meeting agenda.* DOJ withheld this meeting agenda in full. *See* Doc. 50-3, at 21. "Agendas are not themselves deliberative documents." *In re MTBE Prods. Liability Litig.*, 898 F. Supp. 2d 584, 591 (S.D.N.Y. 2012). Even if some portions of this four-page document contained deliberative materials, DOJ was required to

segregate and release the portions that mere "identify topics for discussion, but do not expose deliberative discussions." *United States v. Life Care Ctrs. of Am.*, 2015 WL 10987073, at \*34 (E.D. Tenn. Aug. 31, 2015).

 **CRT Memo on IPC and email threads.** FGA does not dispute that this purportedly draft document and the redacted portions of the emails may contain some opinions that are properly privileged. *See* Doc. 50-3, at 4-5, 10; Ex. A, at 14-19. However, DOJ was required to segregate and release purely factual materials. It is black-letter law that "agencies 'cannot withhold' factual material 'merely by stating that it is in a draft document.'" *Prot. Democracy Proj., Inc. v. HHS*, 569 F. Supp. 3d 25, 41 (D.D.C. 2021). DOJ does not explain why the purely factual information contained in the two-page document could not be reasonably segregated and release. DOJ also failed to explain its refusal to segregate non-exempt material from the email threads.

## II. Alternatively, the Court should at a minimum order *in camera* inspection and limited discovery.

 Even if the Court does not believe it should grant summary judgment in FGA's favor, the Court should at a minimum order *in camera* inspection and limited discovery to resolve any remaining fact issues surrounding the applicability of Exemption 5.

 The Court has wide discretion to use a "combination" of "discovery" and "*in camera* review" to resolve any remaining factual issues regarding the applicability of Exemption 5. *Bloche v. DOD*, 370 F. Supp. 3d 40, 55 (D.D.C. 2019). It should be unsurprising that courts have ordered *in camera* review to do just that. *ACLU*, 2016 WL 889739, at \*7 (ordering *in camera* inspection to decide the viability of the "presidential

communications privilege"); *Brennan Ctr.*, 2019 WL 10984173, at *7 (same). The Court should, at a minimum, inspect for itself all of the withheld documents at issue here to determine whether Exemption 5 was properly asserted and if the withheld information could not be reasonably segregated.

Moreover, "discovery is not unheard of in a FOIA action," especially if there are "multiple issues of fact" and "discrepancies" in agency affidavits. *Scudder v. CIA*, 25 F. Supp. 3d 19, 50 (D.D.C. 2014); *see also Tax Analysts v. IRS*, 214 F.3d 179, 185 (D.C. Cir. 2000) (discovery necessary to develop factual record); *CREW v. Nat'l Indian Gaming Comm'n*, 467 F. Supp. 2d 40, 56 (D.D.C. 2006) (noting "limited discovery has been allowed" in presence of material conflict in agency affidavits).

Limited discovery would also help determine how DOJ is implementing EO 14019 and the extent to which DOJ circulated the Final Implementation Plan—all of which will bear on DOJ's claim of the presidential communications and deliberative process privileges. For instance, FGA could request production of documents sufficient to show how widely DOJ distributed the Final Implementation Plan (e.g., with whom and which components). *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26 (wide distribution relevant to claims of the presidential communications privilege); *Aug*, 425 F. Supp. at 950-51. FGA could also depose a limited number of custodians whom DOJ identified (Pamela Karlan, Carrie Pagnucco, Chris Herren, Alberto Ruisanchez, Adam Grogg, and Sparkle Sooknanan), Brinkmann Decl. ¶9, regarding the purportedly advisory nature of the Final Implementation Plan and about how EO 14019 is being implemented by DOJ.

## CONCLUSION

The Court should grant summary judgment in FGA's favor. Alternatively, the Court should order *in camera* inspection and limited discovery.

Dated: November 3, 2022                    Respectfully submitted,

                                             /s/ *Jeffrey M. Harris*
                                           Jeffrey M. Harris (pro hac vice)
                                           Frank H. Chang (pro hac vice)
                                           CONSOVOY MCCARTHY PLLC
                                           1600 Wilson Blvd., Ste. 700
                                           Arlington, VA 22209
                                           (703) 243-9423
                                           jeff@consovoymccarthy.com
                                           frank@consovoymccarthy.com

## CERTIFICATE OF SERVICE

I filed the foregoing via ECF, which will electronically notify all counsel of record.

Dated: November 3, 2022                      /s/ *Jeffrey M. Harris*

## LOCAL RULE 3.01(g) CERTIFICATION

To the extent that this certification is required for FGA's alternative request for *in camera* inspection and limited discovery, I certify that on November 2, 2022, the parties conferred via phone and email. DOJ believes that FGA's request is premature.

Dated: November 3, 2022                      /s/ *Jeffrey M. Harris*