**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

|  |  |  |
|---|---|---|
| THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY, | ) ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 2:22-cv-00252-JLB-MRM |
| v. | ) ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) ) ) | |
| *Defendant.* | ) ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MISCELLANEOUS RELIEF**

Plaintiff Foundation for Government Accountability (FGA)'s Cross-Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment is based on the false premise that DOJ's Strategic Plan represents a "[f]inal [i]mplementation [p]lan" "governing DOJ's day-to-day operations." Pl.'s Cross-Mot. for Summ. J. and Alternatively, for *In Camera* Inspection and Limited Discovery and Opp'n to Def.'s Mot. for Summ. J. at 1, ECF No. 52 ("Pl.'s Cross-Mot."). To the contrary, as DOJ explained in the declarations it submitted with its Motion for Summary Judgment, DOJ's Strategic Plan represents policy ideas that DOJ submitted to the White House as part of ongoing deliberations within DOJ, between DOJ and the White House, and within the White House regarding potential next policy steps related to voting access issues. The Plan thus falls squarely within the presidential

communications privilege and the deliberative process privilege prongs of FOIA Exemption 5, and DOJ therefore properly withheld it in full.   As for the other challenged documents, FGA has not substantially challenged DOJ's basis for withholding them in full or in part and has failed to address the presumption of regularity that applies to DOJ's declarations regarding the segregability analysis it underwent.   For these reasons, the Court should grant DOJ's motion for summary judgment and deny FGA's cross-motion.

## RESPONSE TO FGA'S STATEMENT OF MATERIAL FACTS

1-3.    Not material because the cases and sources that FGA cites have no bearing on whether DOJ properly asserted FOIA Exemption 5 over the challenged records or portions thereof.

4-8.    Not material because Executive Order ("EO") 14019 and the cited letters speak for themselves.   DOJ disputes any allegation inconsistent with the text of the EO or the text of the cited letters.

9.    Undisputed.

10.    Undisputed that FGA submitted its FOIA request on July 30, 2021, and that FGA filed suit regarding that request on April 20, 2022, at which point DOJ had not yet provided a final response to FGA's FOIA request.

11.    Disputed, but not material.  In the Case Management Report, filed on July 5, 2022, DOJ proposed a schedule that would have resulted in the production of all responsive, non-exempt documents by December 30, 2022.   *See* ECF No. 24 at 11.

But FGA's inaccurately stated date is not material to whether DOJ properly asserted Exemption 5 over the challenged documents or portions thereof.

12.     Not material because the Case Management Report speaks for itself. DOJ disputes any allegation inconsistent with the text of the Report.

13.     Undisputed that Magistrate Judge Dudek ordered DOJ to produce all responsive, non-exempt documents by September 8, 2022.

14.     Undisputed that DOJ produced 135 pages of records to FGA on September 8, 2022, some of which contained redactions, all of which were responsive to Request 4, and one of which was incidentally responsive to Request 5, and that DOJ withheld its Strategic Plan in full.

15.     This paragraph states a legal dispute between the parties, not a material fact.

16-20. Not material because FGA's Exhibits A and B speak for themselves. DOJ disputes any allegation inconsistent with the text of those Exhibits.

21.     Undisputed that the Offices of the Deputy Attorney General and the Associate Attorney General and the Civil Rights Division engaged in internal deliberations regarding the development of DOJ's Strategic Plan and that EO 141019 gave the Federal Bureau of Prisons (BOP) and the United States Marshals Service (USMS) specific implementation tasks.  DOJ disputes that the EO required the participation of all of the above offices and the suggestion that the Probation and Pretrial Services Office is part of DOJ, but neither of these alleged facts is material to whether DOJ properly asserted Exemption 5 over the challenged records or portions thereof.

22.     Undisputed.

23. Not material because the cited statement on DOJ's website speaks for itself. DOJ disputes any allegation inconsistent with the text of the cited statement.

## ARGUMENT

### I.  CRT performed an adequate search.

FGA has indicated that it does not challenge the adequacy of the search conducted by CRT. Pl.'s Cross-Mot. at 6 n.1. Therefore, for the reasons previously stated, *see* Def.'s Mot. for Summ. J. at 6-9, ECF No. 50, summary judgment is appropriate for DOJ on the adequacy of the search.

### II.  DOJ properly withheld records under FOIA Exemption 5.

#### a.  The working law doctrine is inapplicable.

FGA argues that the working law doctrine categorically bars the application of Exemption 5 to DOJ's Strategic Plan because the Strategic Plan "amounts to [DOJ's] effective law and policy." Pl.'s Cross-Mot. at 9-10. The working law doctrine instructs that "the reasons which . . . suppl[ied] the basis for an agency policy actually adopted[,] . . . if expressed within the agency, constitute the 'working law' of the agency" and are therefore outside the bounds of FOIA Exemption 5. *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 152-53 (1975). Contrary to FGA's "overly expansive view of the 'working law' doctrine," however, it is not true that "any statement that describes the agency's existing policies is working law." *Hall & Assocs. v. United States Env't Prot. Agency*, No. CV 19-330 (RDM), 2022 WL 4482569, at *15 (D.D.C. Sept. 27, 2022). Rather, "'working law,' as that term has been applied by the Supreme Court and the

4

D.C. Circuit, generally refers to documents that carry some measure of authoritative weight within the agency, not to isolated sentences or facts included within a larger record that is not intended to convey or to implement settled agency policy." *Id.*

FGA's argument regarding the working law doctrine fails for two reasons. First, the application of the presidential communications privilege does not turn on whether the Strategic Plan constituted DOJ's working law. The working law doctrine applies only to limit the applicability of the deliberative process privilege. *See Federal Open Market Committee of Federal Reserve System v. Merrill*, 443 U.S. 340, 360 n.23 (1979) (limiting *Sears* to privileges associated with predecisional communications). Even "*Sears* itself held that a memorandum subject to the affirmative disclosure requirements of [5 U.S.C.] § 552(a)(2) was nevertheless shielded from disclosure under Exemption 5 because it contained a privileged attorney's work product." *Id.* The working law doctrine therefore does not categorically bar the application of the presidential communications privilege even to documents that express an agency's final decisions regarding policy and constitute the agency's effective law and policy. Thus, the Court must consider DOJ's arguments regarding the applicability of the presidential communications privilege before performing any other analysis.

Second, FGA's underlying assumption is false; the Strategic Plan does not constitute DOJ's working law. When assessing whether a document represents the agency's working law such that its withholding is barred, it is "[c]rucial . . . [that the court] understand[] . . . the function of the document[] in issue in the context of the administrative process which generated [it]." *Sears*, 421 U.S. at 138, 153; *see also Hall*

& *Assocs.*, 2022 WL 4482569, at *15 ("Correctly understood, . . . the inquiry into whether a document contains 'working law' often focuses as much on 'the function and significance of the document in the agency's decisionmaking process' as it does on the substance of the document's statements." (quoting *Tax'n With Representation Fund v. I.R.S.*, 646 F.2d 666, 678 (D.C. Cir. 1981)).   Here, DOJ's Strategic Plan serves the function of informing the President's immediate advisor, Ambassador Susan Rice, about DOJ's policy ideas for supporting the voting access goals expressed in EO 14019.   *See* EO 14019 § 3.   EO 14019's directive that each agency develop "a strategic plan outlining the ways . . . that the agency can promote voter registration and voter participation" underscores the potentially deliberative nature of the plans by requesting input on ways each agency "*can*" accomplish those objectives—rather than input on ways each agency *will* do so.   *Id.*   The information in DOJ's Strategic Plan was for Ambassador Rice's use in "briefing and advising the President on voting rights and voting access issues" to "inform subsequent presidential decisionmaking on voting matters."   *See* Decl. of Vanessa R. Brinkmann ¶¶ 7, 10, ECF No. 50-4 ("Brinkmann Decl.").   Thus, "the function of the [Plan] in the context of the administrative process which generated [it]" was to provide information to the White House to aid in ongoing White House deliberations about potential future policy-making on voting rights and access issues.   *Sears*, 421 U.S. at 138.

Where, as here, a document "reflect[s] . . . recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," the deliberative process privilege applies.   *Dep't of Interior v. Klamath*

*Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *Sears*, 421 U.S. at 150). The working law doctrine is inapplicable because the Strategic Plan "do[es] not constitute or establish 'law' in the sense of setting forth a decision that binds subordinates or a regulated party. Rather, the [Strategic Plan] document[s] advice given up the chain to someone (the President) . . . [to inform his future] decision[making]." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1113 (D.C. Cir. 2019) (rejecting a working law doctrine argument and affirming the application of the presidential communications privilege); *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (indicating that "ideas and theories which go into the making of the law" cannot be classified as working law and are, instead, eligible for privilege protections). In other words, even if any of the policy ideas discussed in the Strategic Plan were later decided upon and implemented by DOJ, that fact would not transform the Strategic Plan or portions thereof into the working law of the agency. Rather, the working law doctrine instructs that the policies themselves would need to be disclosed to the public. *See Sears*, 421 U.S. at 153. Whether any such policy ideas were included in the Strategic Plan is another matter entirely, however, and the working law doctrine does not require disclosure on that issue.

FGA counters that because DOJ's website and various email communications discuss "implementation" of EO 14019, the Strategic Plan must constitute DOJ's working law. *See* Pl.'s Cross-Mot. at 12. But FGA wholly ignores the fact that, because EO 14019 called for submission of strategic plans from federal agencies, agencies were implementing EO 14019 by submitting the plans, even if some or all of

the policy ideas mentioned in the plans are never decided on or are eventually decided against.  None of the communications that FGA cites indicates that DOJ's Strategic Plan constituted a statement of DOJ's working law such that Exemption 5 would be inapplicable.  *See id.* at 13.  To the contrary, the statements only reinforce DOJ's contention that the Plan was part of broader White House deliberations about voting rights issues and that the Plan included policy ideas that had not yet been decided upon.  *See, e.g.*, Pl.'s Ex. A at 13, ECF No. 52-2 (a White House employee commending the "*ideas*" agencies had developed in light of the EO (emphasis added)).  The statements on DOJ's website regarding BOP and USMS taking steps to promote voting access do not "confirm[] that the Plan is effective law and policy."  *See* Pl.'s Cross-Mot. at 12-13.  Instead, these statements merely reflect EO 14019's specific instructions regarding actions for BOP and USMS to take.  EO 14019 § 9.  Finally, even assuming that the strategic plan template the White House sent to federal agencies indicates that the White House may have desired for agencies to be more definitive in their ideas, and even if DOJ's Strategic Plan had expressed definitive, decided-upon policy courses of action, the Plan itself would not constitute the working law of the agency because that was not the Plan's function in its administrative context.  *See Sears*, 421 U.S. at 138.  Because DOJ's Strategic Plan did not express and was not designed to express DOJ's "effective law and policy," the working law doctrine is inapplicable and, therefore, Exemption 5 is fully applicable.  *Id.* at 153; *see Hall & Assocs.*, 2022 WL 4482569, at *15.

8

### b. DOJ properly withheld information under Exemption 5 based on presidential communications.

It is well-settled law that the President need not personally invoke the presidential communications privilege in FOIA. *See, e.g., Am. Ctr. for L. & Just. v. U.S. Dep't of State*, 330 F. Supp. 3d 293, 308 (D.D.C. 2018) ("[E]ven assuming that the President must personally invoke the presidential communications privilege in civil discovery, . . . this requirement is not imported into the far different context of FOIA." (cleaned up)); *Elec. Priv. Info. Ctr. v. Dep't of Justice*, 584 F. Supp. 2d 65, 81 (D.D.C. 2008) ("There is no indication in the text of FOIA that the decision to withhold documents pursuant to Exemption 5 must be made by the President"); *Loving v. Dep't of Defense*, 496 F. Supp. 2d 101, 108 (D.D.C. 2007) ("personal invocation [of the presidential communications privilege] is not required as to FOIA requests"), *aff'd*, *Loving*, 550 F.3d 32 (D.C. Cir. 2009). In the FOIA context, there is no specific invocation of a privilege whatsoever. *See, e.g.*, *Lardner v. DOJ*, No. CIV.A.03-0180(JDB), 2005 WL 758267, at *8 (D.D.C. Mar. 31, 2005) (unlike in the discovery context, in FOIA cases "[a]n agency does not invoke a privilege against discovery when it withholds a document under one of the [statutory] exemptions"). Instead, here, DOJ has "simply ma[d]e[] the determination that a statutory provision protects the [Strategic Plan] from disclosure[] and [has] with[e]ld the document[] on that ground." *Id.*; *see, e.g.*, *FTC v. Grolier Inc.*, 462 U.S. 19, 27-28 (1983) (rejecting argument that documents ordered disclosed during civil discovery in previous litigation must be disclosed under FOIA because "[i]t is not difficult to imagine

9

litigation in which on party's need for otherwise privileged documents would be sufficient to override the privilege but that does not remove the documents from the category of the *normally* privileged"); *Stonehill v. I.R.S.*, 558 F.3d 534, 539 (D.C. Cir. 2009) ("FOIA Exemption 5 . . . incorporates the privileges the government *typically enjoys* in pretrial discovery" (emphasis added)); *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1257 (11th Cir. 2008) (similar). Importing discovery principles, such as the requirement of personal invocation of a privilege, to FOIA cases would create an unworkable burden given the volume of FOIA requests. *See Berman v. CIA*, 378 F. Supp. 2d 1209, 1220 & n.11 (E.D. Cal. 2005) (a requirement of personal invocation "would expose the President to considerable burden"). Here, DOJ has sufficient knowledge of the content, nature, and purpose of the Strategic Plan to assert Exemption 5 for presidential communications. *See* Brinkmann Decl. ¶¶ 3, 12-16.

FGA erroneously asserts that "binding precedent" precludes DOJ from claiming Exemption 5 for presidential communications. Pl.'s Cross-Mot. at 16. But none of the cases to which FGA cites requires that the President himself assert the privilege. Many of the cases, including *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021), are completely inapposite because they do not involve FOIA. Instead, as is required to qualify for Exemption 5, the Strategic Plan "fall[s] within the ambit of a privilege against discovery under judicial standards that would govern litigation against [DOJ]" and, thus, DOJ may withhold the Plan under Exemption 5 for presidential communications. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

Not only does DOJ possess the authority to withhold the Plan under Exemption 5 for presidential communications, but it properly did so in this case. FGA claims that DOJ's Plan does not implicate "presidential decisionmaking and deliberations," *Trump*, 20 F.4th at 25, because "President Biden made his decision when he issued EO 14019 and ordered all federal agencies to develop strategic plans to increase voter registration and participation." Pl.'s Cross-Mot. at 18. Such a wooden interpretation of presidential decisionmaking is illogical. President Biden's request for strategic plans from federal agencies in EO 14019 was merely one decision in a series of potential future decisions on voting rights issues, which were to be informed by the information his immediate advisors received from agencies in their strategic plans. *See* Brinkmann Decl. ¶¶ 7-10. Further, FGA's suggestion that DOJ's Strategic Plan could not possibly have been for the President because it was *DOJ*'s plan is odd, *see* Pl.'s Cross-Mot. at 18, considering that the Plan was prepared for and delivered to the White House, in response to the White House's directive that DOJ provide that information.

FGA's concern that EO 14019's structure of requiring agencies to submit strategic plans to the White House could create a loophole to the working law doctrine is unfounded. *See id.* at 19. To the extent that DOJ has completed concrete internal actions to implement EO 14019 beyond the submission of its Strategic Plan, the records directing those actions would be affirmatively published or obtainable through a FOIA request seeking such records. FGA does not allege that DOJ has adopted any voting access policies that have not been made public, nor does FGA's FOIA request

seek information on what DOJ's actual policies regarding voting access are. Instead, FGA seeks the substance of the ideas on voting access policies that DOJ provided to the White House as part of ongoing deliberations.

FGA also fails to plausibly allege "wide[] distribution" of the Strategic Plan "beyond th[e] purposes" of advising the President that could defeat the application of the presidential communications privilege. *See id.* FGA assumes that because DOJ's implementation of EO 14019 involved the participation of various DOJ components, the Strategic Plan was distributed to each of these components for non-advisory purposes. *Id.* at 20. But there is no evidence of such a distribution, and, instead, DOJ's declaration indicates that the distribution of the draft Plan within the agency was for the advisory purpose of "developing [the] . . . [P]lan" to provide to the White House. *See* Brinkmann Decl. ¶ 9. In contrast, in the cases FGA cites, the presidential communications privilege was undermined only where the documents at issue were distributed widely for purposes *unrelated* to formulating advice for the President or his immediate advisors. *See Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, 560 F. Supp. 3d 810, 827, 829 (S.D.N.Y. 2021) (the privilege did not apply to emails from the White House Chief of Staff to Senior Government Officials which were then forwarded to other individuals within agencies "for . . . non-advisory purpose[s]" unrelated to "creat[ing] advice for the President"); *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. United States Dep't of State*, 2019 WL 10984173, at *6 (S.D.N.Y. Mar. 29, 2019) ("if the information contained within the withheld documents [which consisted of communications from a Cabinet-level official to the

President for the purpose of advising the President] ha[d] been widely and publicly disseminated" *after* the documents were provided to the President, "the rationale for applying the presidential communications privilege is much less compelling"); *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 27 (D.D.C. 2013) (the privilege is undermined where a White-House-generated document sent to agencies was distributed "beyond the President's closest advisors for non-advisory purposes"). FGA cites to no case indicating that intra-agency conversations regarding a draft of a report to be sent to the President's immediate advisor for purposes of advising the President constitute wide dissemination that could even possibly undermine the presidential communications privilege. For all these reasons, DOJ properly withheld the Strategic Plan in its entirety under Exemption 5 based on presidential communications.[1]

### c. DOJ properly withheld information under Exemption 5 based on deliberative process.

#### i. The Strategic Plan

In addition to withholding the Strategic Plan in full under the presidential communications privilege, DOJ also properly withheld portions of the Plan under the deliberative process privilege, because those portions involve DOJ deliberations about

---

[1] Portions of the Strategic Plan are also exempt from disclosure under the deliberative process prong of Exemption 5 because the Plan was designed to aid in ongoing White House deliberations about voting access issues and preceded decisions made in that process. *See* Brinkmann Decl. ¶ 24. The arguments regarding the White House's equities on deliberative process grounds overlap in large part with the arguments favoring the application of the presidential communications privilege.

potential steps to take that DOJ had not yet decided upon. *See* Brinkmann Decl. ¶¶ 23-24. FGA argues that the Plan is not exempt from release under the deliberative process prong of Exemption 5 based on the faulty assumption that the Strategic Plan represented DOJ's final decisions on what steps to implement. Pl.'s Cross-Mot. at 21-22. As explained above, however, this characterization is false. Rather, portions of the Strategic Plan were devoted to describing policy ideas upon which the Department had not rendered a decision, including "proposed plans for non-enforcement policy actions by various components within DOJ," "deliberations as to possibilities for future plans of action, based on ongoing research and considerations within DOJ," information regarding "ongoing deliberations with other agencies" about how DOJ could be of assistance to those agencies, and "anticipated timelines for completion of specific initiatives." Brinkmann Decl. ¶ 24. And the privilege still applies even though DOJ sent the Plan with these ideas to the White House. *See, e.g.*, *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786, 788 (2021) (holding that "[t]he deliberative process privilege protect[ed] the draft biological opinions [sent by the United States Fish & Wildlife Service to an outside agency, the Environmental Protection Agency] . . . because they reflect a preliminary view—not a final decision" and the Services "did not" "treat[] [the drafts] as final").

FGA does not even attempt to address, and has therefore conceded, DOJ's arguments that disclosure of the deliberative portions of the Strategic Plan would cause foreseeable harm. Thus, DOJ's arguments stand regarding the high potential for public confusion regarding policy ideas mentioned in the Plan that were never

14

implemented, the significant chilling effect that disclosure would have on the willingness of agency employees to be candid about policy ideas in correspondence with the White House in the future, particularly regarding voting access issues, and the resulting detrimental effect on the integrity of the decision-making process as a whole.  *See* Def.'s Mot. for Summ. J. at 23.  DOJ therefore properly withheld the Strategic Plan under Exemption 5 based on the deliberative process privilege.

### ii.  The other records in dispute

FGA raises few arguments disputing the applicability of the deliberative process prong of Exemption 5 to the other records or portions thereof that are in dispute, none of which is sufficient for FGA to prevail.  Most importantly, FGA fails to undercut or even acknowledge that, having attested to releasing all non-exempt information, DOJ is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  FGA's only argument regarding the draft document proposing answers to questions posed by the White House Counsel's Office regarding EO 14019, which DOJ withheld in full, *see* Def.'s *Vaughn* Index at 3-4 (entry 12), ECF No. 50-3, and the email discussions between DOJ employees regarding EO 14019, which DOJ withheld in part, *see id.* at 4, 9 (entries 17 & 51), is that DOJ failed to "explain why the purely factual information contained in the two-page document could not be reasonably segregated and release[d]" and why it "refus[ed] to segregate non-exempt material from the email threads."  Pl.'s Cross-Mot. at 23.  But these arguments ignore

15

the sworn declarations attesting that DOJ complied with its segregability obligations and conducted careful, line-by-line review of the records in question to determine whether any portions were segregable from the deliberative materials. *See* Decl. of Kilian Kagle ¶ 43, ECF No. 50-2 ("Kagle Decl."); Brinkmann Decl. ¶ 34. FGA's arguments regarding these documents therefore fail. Moreover, FGA has not challenged the foreseeable harm that would result from the release of these records or the withheld portions thereof. Def.'s Mot. for Summ. J. at 16-19. The Court should therefore uphold DOJ's withholdings.

DOJ also properly withheld portions of DOJ employee Ms. Carrie Pagnucco's notes from a listening session with voting rights stakeholders. FGA first argues that such notes are not deliberative whatsoever because they allegedly contain purely factual material from the listening session. Pl.'s Cross-Mot. at 22. Even if this were so, however, "purely factual material may be withheld where it reflects an exercise of discretion and judgment calls." *Nat'l Whistleblower Ctr. v. Dep't of Health and Hum. Servs.*, 849 F. Supp. 2d 13, 37 (D.D.C. 2012) (internal quotation marks omitted) (quoting *Mapother v. U.S. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993)). As the D.C. Circuit has noted, "[o]n several occasions, [it] ha[s] permitted agencies to withhold factual material on the ground that its disclosure would expose an agency's policy deliberations to unwarranted scrutiny." *Mapother*, 3 F.3d at 1537. Ms. Pagnucco's notes present just such a scenario because the listening session was designed to aid agency deliberations regarding voting access initiatives and her notes were intended to inform internal DOJ deliberations on that issue. Kagle Decl. ¶ 41.

16

Thus, disclosure of even portions of the notes that could be construed as "purely factual" "would inevitably reveal the government's deliberations." *Nat'l Whistleblower Ctr.*, 849 F. Supp. 2d at 38 (internal quotation marks and citation omitted).

FGA argues in the alternative that "DOJ failed to carry its burden" on segregability, Pl.'s Cross-Mot. at 22, but this argument is again falsely premised on the notion that, once DOJ has attested to appropriate segregation, DOJ has a further burden to prove segregability. Given the deliberative nature of Ms. Pagnucco's notes, the sworn declarations, the presumption of a proper segregability analysis, and FGA's failure to challenge the foreseeable harm that would result from the release of the withheld portions of the notes, the Court should uphold DOJ's withholding. *See* Def.'s Mot. for Summ. J. at 20; Kagle Decl. ¶ 43.

Finally, FGA's arguments regarding the meeting agenda that DOJ withheld, *see* Def.'s *Vaughn* Index at 20-21 (entry 132), also fail. FGA cites one case from the U.S. District Court for the Southern District of New York for the proposition that an agenda cannot be classified as a deliberative document. Pl.'s Cross-Mot. at 22. But FGA fails to engage with the contrary and more recent authority that DOJ cited from the U.S. District Court for the District of Columbia—the court that most commonly handles FOIA cases, which held that "[a] meeting agenda prepared before the meeting is necessarily predecisional and inherently deliberative in that staff are suggesting the topics to be discussed at the meeting." *Ctr. for Pub. Integrity v. Fed. Election Comm'n*, 332 F. Supp. 3d 174, 180 (D.D.C. 2018). FGA also fails to engage with the circuit court authority that DOJ cited, indicating instances in which meeting

agendas were properly withheld as deliberative.  *See* Def.'s Mot. for Summ. J. at 21. The weight of authority, therefore, supports DOJ's argument that a meeting agenda may be properly withheld under FOIA Exemption 5, particularly where, as here, the agenda pre-dates the meeting, describes topics for potential discussion at the meeting, and includes possible talking points and options for participants that were not necessarily implemented at the meeting itself.  *See* Kagle Decl. ¶ 42.  FGA once again fails to acknowledge the sworn declarations describing DOJ's careful segregability analysis, and the presumption of regularity and good faith to which those declarations are entitled.  *See* Pl.'s Cross-Mot. at 22-23.  FGA does not dispute that disclosure of the agenda would cause foreseeable harm.  *See* Def.'s Mot. for Summ. J. at 21-22. For these reasons, the Court should uphold DOJ's withholding.

### III.   FGA has failed to advance arguments that would justify *in camera* inspection, much less discovery.

FGA asserts that even if the Court is not inclined to grant it summary judgment, it should order *in camera* inspection of all the challenged withheld records or portions thereof and discovery, to include production of certain documents and depositions of DOJ document custodians. Pl.'s Cross-Mot. at 23-24.  But this request is inconsistent with the circumstances under which *in camera* inspection is undertaken, and discovery is wholly inappropriate.  As the cases FGA cites make clear, *in camera* review is appropriate in a FOIA case "[w]here [the] agency [has] fail[ed] to meet its burden" to show that the records or portions thereof are properly exempt.  *Bloche v. Dep't of Def.*, 370 F. Supp. 3d 40, 55 (D.D.C. 2019) (citation omitted); *see also ACLU v. Dep't of Just.*,

No. 15 CIV. 1954 (CM), 2016 WL 889739, at *2 (S.D.N.Y. Mar. 4, 2016) (unpublished) (requiring *in camera* review because it was impossible to "ascertain whether the presidential communications privilege actually protect[ed] [the document] . . . without seeing [it]"); *Brennan Ctr. for Just.*, 2019 WL 10984173, at *7 (*in camera* review appropriate because "Defendant's submissions ha[d] not adequately explained how the information contained in the withheld documents differs from the information that the Administration has publicly disseminated"). DOJ has met its burden to show that FOIA Exemption 5 applies to the records or portions thereof that have been withheld. *In camera* review is therefore unnecessary.[2] *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979) ("When the agency meets its burden by means of affidavits, in camera review is neither necessary nor appropriate.").

Not only is *in camera* review unnecessary here, but discovery is certainly unnecessary and wholly inappropriate. Limited discovery in a FOIA case is warranted only "where there is evidence . . . that the agency acted in bad faith."[3] *In re Clinton*, 973 F.3d 106, 113 (D.C. Cir. 2020), *cert. denied sub. nom. Jud. Watch, Inc. v. Clinton*,

---

[2] Other than the legal principle counseling against *in camera* review absent some deficiency in the declarations, DOJ has no objection to the Court reviewing the documents *in camera* should the Court find it helpful to do so.

[3] Even if FGA had met this threshold requirement, its asserted rationales for discovery are unpersuasive. Information on how DOJ is continuing to implement the EO would not bear on the presidential communications or deliberative process prongs of Exemption 5, *see* Pl.'s Cross-Mot. at 24, because it would not change the nature of the Strategic Plan as designed to inform advice to the President regarding ongoing deliberations on voting rights issues. And the extent to which DOJ circulated a draft Plan would not undermine the Plan's presidential communications nature, *see id.*, because there is no plausible allegation that it was widely distributed for non-advisory purposes.

141 S. Ct. 1740 (2021).    There is no such evidence of bad faith here. Moreover, discovery in FOIA cases is rare, and all the examples FGA points to involve "multiple issues of fact," "discrepancies," or other "material conflict[s]" in agency affidavits.  Pl.'s Cross-Mot. at 24.  FGA does not even attempt to show that such issues are present in the affidavits DOJ has supplied, nor could it.  Discovery is therefore inappropriate and should be rejected.

## CONCLUSION

For the foregoing reasons, this Court should uphold DOJ's assertion of Exemption 5 over the challenged withholdings, grant DOJ's motion for summary judgment, and deny FGA's cross-motion for summary judgment.

Dated: December 5, 2022          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director

*/s/   Laurel H. Lum*
LAUREL H. LUM
Trial Attorney (NY Bar No. 5729728)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St NW
Washington, D.C. 20005
Telephone: (202) 305-8177
Email: laurel.h.lum@usdoj.gov
*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 5, 2022, I filed the foregoing via the

CM/ECF system, which will send a Notification of Electronic Filing to:

> **Jeffrey M. Harris**
> **Frank H. Chang**
> Consovoy McCarthy PLLC
> 1600 Wilson Blvd. Suite 700
> Arlington, VA 22209
> (202) 321-4120
> (703) 243-9423
> (727) 504-8994
> jeff@consovoymccarthy.com
> frank@consovoymccarthy.com

<u>/s/ Laurel H. Lum</u>
LAUREL H. LUM
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Phone: 202-305-8177
Email: laurel.h.lum@usdoj.gov