UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THE FOUNDATION FOR GOVERNMENT
ACCOUNTABILITY,

     Plaintiff,

v.                             Case No:   2:22-cv-252-JLB-KCD

U.S. DEPARTMENT OF JUSTICE,

     Defendant.

_____

## **ORDER**

In this Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, case, Plaintiff, the Foundation for Government Accountability ("FGA"), requests that the Court order Defendant, the United States Department of Justice ("DOJ"), to respond to FGA's FOIA requests and produce to FGA responsive documents related to President Biden's Executive Order 14019 ("EO 14019").  EO 14019 directed the head of each executive agency, including DOJ, to submit to the White House a Strategic Plan outlining the ways the agency can promote voter registration and voter participation.

Before the Court is DOJ's Motion for Summary Judgment (Doc. 50) and FGA's Cross-Motion for Summary Judgment and, Alternatively, for *In Camera* Inspection and Limited Discovery and Opposition to Defendant's Motion for Summary Judgment (Doc. 52).  DOJ has responded (Doc. 56), and FGA has replied (Doc. 57).  After careful review of the pleadings and the entire record before the Court, the Court **GRANTS** in part and **DENIES** in part DOJ's Motion for

Summary Judgment (Doc. 50) and **GRANTS** in part and **DENIES** in part FGA's
Motion for Summary Judgment (Doc. 52).

The Court hereby orders DOJ to provide the Court for *in camera* review
copies of the withheld documents identified in *Vaughn* Index entries 53 and 71
because a genuine issue of material fact exists as to whether the deliberative
process privilege applies to those documents.

The Court further orders DOJ to provide the Court for *in camera* review a
copy of DOJ's "STRATEGIC PLAN for the Implementation of Executive Order
14019, Promoting Access to Voting," listed at the bottom of its *Vaughn* Index.  This
Strategic Plan was identified as responsive to FGA's FOIA request but was
withheld from disclosure based on DOJ's contention that the presidential
communications privilege and the deliberative process privilege apply.  Based on a
review of the entire record before the Court, viewing the facts in the light most
favorable to DOJ, the Court holds that the deliberative process privilege does not
apply to the Strategic Plan and that genuine issues of material fact remain as to the
applicability of the presidential communications privilege.

## FACTS

On March 7, 2021, President Biden signed EO 14019, entitled "Promoting
Access to Voting."  86 Fed. Reg. 13,623.  Section 3(b) of EO 14019 provides as
follows: "Within 200 days of the date of this order, the head of each agency shall
submit to the Assistant to the President for Domestic Policy a strategic plan
outlining the ways identified under this review that the agency can promote voter

registration and voter participation."  *Id.* § 3(b).

FGA describes itself as "a non-partisan, non-profit organization that helps millions achieve the American dream by improving welfare, work, health care, and election integrity policy in the states and in Washington, D.C."  (Doc. 1 at ¶ 4).  On July 30, 2021, FGA submitted FOIA requests to DOJ, requesting the production of documents containing the following information:

1. DOJ's "strategic plan developed pursuant to [EO 14019] outlining ways [the DOJ] identified . . . to promote voter registration and voter participation, as directed by EO 14019."

2. "[A] copy of the written explanation for the decision provided by the head of [the] agency to President Biden, as directed by EO 14019" if DOJ "declined to consent to a request by a State to be designated as a voter registration agency pursuant to section 7(a)(3)(B)(ii) of the National Voter Registration Act."

3. "[A]ny formal notifications provided to any State in which [DOJ] provides services notifying the State that [DOJ] would agree to designation as a voter registration agency pursuant to section 7(a)(3)(B)(ii) of the National Voter Registration Act."

4. "[A]ll communications with the White House related to Executive Order 14019 and/or the strategic plan requested through EO 14019," including "any and all communications with the Vice President's Office and staff, as well as with Domestic Policy Advisor Susan Rice and her staff related to

3

EO 14019."

5. "[A]ll communication between [DOJ] and the non-profit organization Demos and/or any of its employees or officers or the 501(c)(4) organization associated with Demos, known as 'Demos Action,' related to EO 14019," including "the dates, time, and purpose of any meeting(s), in-person or remote, that [DOJ] conducted with Demos, Demos Action, or any of its employees or officers."

(*See* Doc. 1-2 at 2–3).

FOIA mandates that an agency "shall" have twenty business days to notify the requestor of the agency's "determination" as to "whether to comply with such request" and to provide "the reasons therefor."  5 U.S.C. § 552(a)(6)(A)(i).  Section 552(a)(6)(B)(i)–(iii), however, provides that in "unusual circumstances,"[1] the agency may extend this time limit provided that it "notif[ies] the person making the

---

[1] The statute defines "unusual circumstances" as:

    (I)    the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

    (II)    the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

    (III)    the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

5 U.S.C. § 552(a)(6)(B)(iii)(I)–(III).

request . . . and . . . provide[s] the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request."

On August 4, 2021, DOJ Civil Rights Division's ("CRT") FOIA Unit ("the FOIA Unit") sent an acknowledgment letter to FGA regarding its request and assigned the request a request number. (Doc. 50-2 at 22–23). In this letter, CRT's FOIA Unit noted that FGA's request would require the Unit to "examine a voluminous amount of records" and to "consult with other offices in the Civil Rights Division." (*Id.* at 23). The FOIA Unit then noted that "[b]ecause of these unusual circumstances, we are extending the time limit to respond to your request beyond the ten additional days provided by the statute. The time needed to process your request will necessarily depend on the volume and complexity of the records located." (*Id.*) The FOIA Unit offered FGA a chance "narrow the scope of [its] request to limit the number of potentially responsive records or agree to an alternative time frame for processing." (*Id.*) The FOIA Unit also added that "there may be some delay in the processing of [FGA]'s request" because of the COVID-19 pandemic. (*Id.*) The letter neither provided a specific time frame for the FOIA Unit's processing of FGA's request, nor did it provide a date on which a determination was expected to be dispatched. *See* 5 U.S.C. § 552(a)(6)(B)(i).

There is no record evidence that after receiving the acknowledgment letter, FGA made an effort to "reasonably modify the request or arrange such an

alternative time frame."[2]   *See id.* § 552(a)(6)(B)(ii).  On March 23, 2022, nearly eight

months after receiving the letter acknowledging receipt of FGA's request from

CRT's FOIA Unit, Stewart Whitson, a Senior Fellow at FGA, emailed the Unit to

inquire about the status of FGA's request.  (*See* Doc. 1-3 at 2–3).  Two days later,

April N. Freeman, a member of the FOIA Unit responded:

> We referred your request to the Voting Section and the
> Office of the Assistant Attorney General as the offices
> likely to have information pertaining to your request.  We
> recently received information stating they are conducting
> a search for responsive records.  As soon as we receive their
> response, we will review the information and process your
> request accordingly.  I'm unable to provide an estimate of
> completion, but we hope to have a response to you soon.
> Please note, the request number you provided was an auto-
> generated number given by a system this office does not
> monitor.  For future inquiries, please reference request
> number, 21-00271-F.

(*Id.* at 2).

On April 20, 2022, still having not heard whether DOJ would comply with

FGA's requests, FGA filed this lawsuit to compel DOJ to search for and, where

appropriate, to produce responsive records.  (Doc. 1 at ¶¶ 29–30).  There are two

counts in FGA's Complaint: Count I asserts that DOJ failed to comply with FOIA by

failing to (1) timely make and communicate its determination as to each of FGA's

requests and (2) produce the records responsive to FGA's FOIA requests; and Count

II asserts that DOJ should not assess any search fees associated with FGA's FOIA

---

[2] The statute states that such refusal is "a factor in determining whether
exceptional circumstances exist," warranting "additional time" for the agency "to
complete its review of the records."  *See* 5 U.S.C. § 552(a)(6)(C)(iii).

request.  (*See id.* at ¶¶ 22–35).

In the parties' July 5, 2022 Case Management Report, DOJ stated that it "ha[d] located approximately 5,500 records that are potentially responsive to FGA's FOIA request."  (Doc. 24 at 10).  DOJ also stated that it "offered FGA a generous processing rate of over 1,000 records per month," which DOJ believed "would allow [it] to conclude its responsiveness review by November 1, 2022, and to complete the processing and production of any responsive, non-exempt documents by January 1, 2023."  (*Id.*)  FGA, however, found January 1, 2023 too late a deadline to receive all the documents, stating, "FGA needs the documents that it requested no later than September [2022] to meaningfully make use of the documents, educate the public regarding DOJ's implementation of EO14019, and unearth any improper influence that outside groups may be asserting over federal policies *prior to the 2022 elections*."  (*Id.* at 9) (emphasis in original).

The Magistrate Judge assigned to this case ordered DOJ to produce all non-exempt documents by September 1, 2022.  (Doc. 31).  DOJ moved, unopposed, for a one-week extension, (Doc. 34), which the Court granted, (Doc. 35; Doc. 37), and on September 8, 2022, DOJ produced the responsive, non-exempt records, (Doc. 49 at ¶ 2).  Specifically, the "release comprised 135 pages with redactions and 15 pages withheld in full pursuant to Exemptions 5 and 6[.]" (Doc. 50-2 at ¶ 33).  The 135 pages of documents produced were responsive to Request 4, and, tangentially, Request 5.  (*Id.* at 26).  DOJ also determined that the Strategic Plan identified by the Senior Counsel was responsive to Request 1.  (*Id.*)  Finally, DOJ stated that it

found no records, which were responsive to Requests 2, 3, and 5. (*Id.* at 26–27).

DOJ has provided the Court with a sworn affidavit from Kilian Kagle, the Chief of CRT's FOIA Unit, outlining the steps the Unit took in identifying responsive documents and applying exemptions, where appropriate. (*See* Doc. 50-2). Mr. Kagle states that on October 4, 2021, CRT's FOIA Unit began electronic searches of emails sent or received by five individuals identified as having potentially responsive records. (Doc. 50-2 at ¶¶ 15–16). The searches resulted in 5,057 potentially responsive records. (*Id.* at ¶ 22). These records were reviewed three times, by three individuals within CRT's FOIA Unit, including Mr. Kagle, and ultimately the Unit decided that there were 49 responsive records, consisting of 135 pages of material. (*Id.* at ¶¶ 23–24).

Also on October 4, 2021, the Unit emailed "eight Senior Attorneys that had been identified . . . as potentially having a nexus to the material," and one of these attorneys responded, furnishing a document that was the "STRATEGIC PLAN for the Implementation of Executive Order 14019, Promoting Access to Voting." (*Id.* at ¶ 25). A subsequent search, according to Mr. Kagle, "confirmed that the version [of the Strategic Plan] provided by the Senior Counsel was indeed the final extant copy as submitted via a secure communication pathway to the Executive Office of the President." (*Id.* at ¶ 27).

DOJ has also provided the Court with a declaration from Vanessa Brinkmann, Senior Counsel in the Office of Information Policy ("OIP") at DOJ. (Doc. 50-4 at ¶ 1). Ms. Brinkmann stated that OIP reviewed the 49 records

identified by CRT's FOIA Unit and "requested that CRT withhold certain information pursuant to the presidential communications and deliberative process privileges encompassed by FOIA Exemption 5." (*Id.* at ¶ 5). CRT's FOIA Unit then produced a *Vaughn* Index[3] "address[ing] the withholdings made by [CRT] and [OIP], pursuant to FOIA Exemption 5, in CRT's September 8, 2022 production." (Doc. 50-3 at 2). FGA challenges the withholdings shown at entries 12, 17, 51, 53, 71, and 132 in the *Vaughn* Index, as well as the 15-page Strategic Plan. (*See id.* at 2–22).

## SUMMARY JUDGMENT STANDARD

FOIA cases are generally handled on motions for summary judgment once the documents in dispute are properly identified. *Miccosukee Tribe of Indians of Florida v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008); *Miscavige v. I.R.S.*, 2 F.3d 366, 369 (11th Cir. 1993). Summary judgment should be granted where, viewing the facts in the light most favorable to the non-moving party, there exists "no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In a FOIA case, an agency is entitled to summary judgment if it

---

[3] When an agency applies a FOIA exemption to avoid disclosure of certain documents, the agency must produce a "*Vaughn* Index," which describes each document withheld or redacted and provides an explanation of the reasons for non-disclosure. *See Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973) (creating a "system of itemizing and indexing" that requires agencies invoking FOIA exemptions to "correlate statements made in the . . . refusal justification with the actual portions of the document").

demonstrates that no material facts are in dispute, it has conducted an adequate search for responsive records, and each responsive record which is located was either produced to the plaintiff or is exempt from disclosure. *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980). The Eleventh Circuit has "h[e]ld that in certain cases, affidavits can be sufficient for summary judgment purposes in [a] FOIA case if they provide as accurate a basis for decision as would sanitized indexing, random or representative sampling, *in camera* review, or oral testimony." *Miscavige*, 2 F.3d at 368. Such agency affidavits must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and [not be] controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)). But the "'burden is on the agency' to show that requested material falls within a FOIA exemption." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (quoting 5 U.S.C. § 552(a)(4)(B) and citing *Anderson*, 477 U.S. at 254).

## DISCUSSION

In DOJ's Motion for Summary Judgment, DOJ argues that it "conducted an adequate search and produced all responsive, non-exempt records" and that "any withheld records or portions thereof fall within an exemption to FOIA." (Doc. 50 at

1).  In FGA's Cross-Motion for Summary Judgment, FGA argues that "DOJ is erroneously asserting executive privileges under Exemption 5 and unlawfully withholding the Final Implementation Plan and other public records," and that the Court should order DOJ to produce those documents.

Specifically, FGA asks this Court to order disclosure of documents listed in the *Vaughn* Index at entries 12 (two pages), 17 (four pages), 51 (two pages), 53 (six pages), 71 (six pages), and 132 (four pages), and the separate, 15-page Strategic Plan noted in the last entry of that Index.  (Doc. 52 at 1–2).  Alternatively, FGA asks the Court to order an *in camera* review of those withheld documents.  (*Id.* at 23–24).

## I.    Whether Exemption 5 Applies

The Court will first address whether DOJ's application of Exemption 5 to the above-referenced withheld documents was proper.

As an initial matter, "[t]he purpose of FOIA is to encourage public disclosure of information so citizens may understand what their government is doing."  *Off. of Cap. Collateral Couns., N. Region of Fla. ex rel. Mordenti v. Dep't of Just.*, 331 F.3d 799, 802 (11th Cir. 2003).  "Accordingly, the records at issue in this [case] are presumed to be subject to disclosure unless DOJ affirmatively establishes that the requested records fall into one of FOIA's exemptions."  *Chilivis v. SEC*, 673 F.2d 1205, 1210–11 (11th Cir. 1982).

Exemption 5, as set forth in section 552(b)(5) of FOIA, permits exemption from FOIA disclosure any "inter-agency or intra-agency memorandums or letters

which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5 "incorporates into FOIA the statutory and common law privileges normally available to a party in civil discovery."  *Miccosukee*, 516 F.3d at 1257.  "Stated simply, [a]gency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work product, executive privilege) are protected from disclosure under Exemption 5."  *Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1277 (11th Cir. 2004) (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999)).

Here, DOJ withheld various documents under Exemption 5.  (*See* Doc. 50-2 at 26–27).  Again, those withholdings, which FGA is challenging here, are found at entries 12, 17, 51, 53, 71, 132, and in the last row in the *Vaughn* Index prepared by DOJ.  (*See* Doc. 50-3 at 2–22).  The documents withheld include email chains (*Vaughn* Index entries 17, 51), email attachments (*Vaughn* Index entries 12, 53, 71, 132), and a separate 15-page PDF containing DOJ's strategic plan for implementing EO 14019 (the "Strategic Plan").  (*See id.*)  All these documents were withheld by DOJ pursuant to Exemption 5's deliberative process privilege, but the Strategic Plan was also withheld pursuant to Exemption 5's presidential communications privilege.  (*See id.*)

The purpose of Exemption 5's "deliberative process privilege" is to "allow agencies to freely explore possibilities, engage in internal debates, or play devil's

advocate without fear of public scrutiny." *Moye*, 376 F.3d at 1277.  This privilege serves to prevent the "premature disclosure of proposed policies before they have been finally formulated or adopted and protect[s] against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Id.* (citation omitted).  This includes "documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* (citing *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).  "Even factual material contained in a 'deliberative' document may be withheld pursuant to the privilege where the disclosure of the factual material would reveal the deliberative process or where the factual material is so inextricably intertwined with the deliberative material that meaningful segregation is not possible." *Miccosukee*, 516 F.3d at 1263.

For the deliberative process privilege to apply, two requirements must be met. *See Dep't of  Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  "First, the material must be pre-decisional, i.e., 'prepared in order to assist an agency decision maker in arriving at his decision.'" *Miccosukee*, 516 F.3d at 1263 (quoting *Renegotiation Bd. V. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)).  "Second, it must be deliberative, 'a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Id.* "[T]he key question in Exemption 5 cases [is] whether the disclosure of

materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Comms. Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987).

"A 'predecisional' document is one prepared in order to assist an agency decision-maker in arriving at his decision and may include recommendations, draft documents, proposals suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Moye*, 376 F.3d at 1277.  But "the privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." *Grand Cent. P'ship*, 166 F.3d at 481.

"A document is 'deliberative' if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and, thereby, undermine the agency's ability to perform its functions." *Moye*, 376 F.3d at 1278.  "Therefore, courts must focus on the effect of the material's release . . . and conclude that predecisional materials are privileged to the extent that they reveal the mental processes of decisionmakers." *Id.* (quotation omitted).

i. ***Vaughn* Index Entry 12**

DOJ asserts that *Vaughn* Index entry 12—entitled "[Draft] CRT memo on IPC to Implement Voting EO.docx"—was properly withheld in full.  (*See* Doc. 50 at 15–17; Doc. 50-3 at 4).  In the *Vaughn* Index, the DOJ describes entry 12 as "a draft

document proposing answers to questions presented by the WHCO[4], containing

potential DOJ actions and issues related to the implementation of Executive Order

14019." (Doc. 50-3 at 4–5).  The *Vaughn* Index further notes that "[t]he draft

responses also include redline edits."  (*Id.*)

Mr. Kagle's sworn affidavit states that:

> The draft document was circulated on April 19, 2021,
> months before DOJ sent its Strategic Plan regarding
> potential implementation of [EO] 14019 to the White
> House.  The draft document contains potential DOJ actions
> and potential issues related to the implementation of [EO]
> 14019.  The draft document also contains redline edits to
> the draft answers.  This is an intra-agency document in
> that the draft was circulated within CRT . . . .  [T]he draft
> document was used to inform later draft answers to the
> questions from the White House Counsel's office that were
> created by DOJ leadership offices outside of the Civil
> Rights Division.  The individuals responsible for drafting
> the draft answers in the withheld document were
> responsible for providing preliminary advice to DOJ
> leadership offices on potential eventual answers to provide
> to the White House Counsel's Office.

(Doc. 50-2 at ¶ 40).

The Court agrees that the document was predecisional.  First, the document's

unfinished state—including redline edits—indicates that it does not represent a

final determination or policy from the DOJ.  Furthermore, because the document

was drafted on April 19, 2021, and the Strategic Plan was drafted on September 23,

2021, it is clear that these drafts pre-date the final Strategic Plan memorandum.

Finally, insofar as the document was drafted in order to answer questions posed by

---

4 DOJ defines WHCO in the *Vaughn* Index as "White House Counsel's Office."  (Doc.
50-3 at 2).

the White House Counsel's Office, it was not "peripheral to actual policy formation" but instead had an influence "on the formulation or exercise of policy-oriented judgment." *Grand Cent. P'ship*, 166 F.3d at 481. Accordingly, the DOJ's description of the withheld material confirms that such material is predecisional and deliberative. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (explaining that a document is predecisional where "it was generated before the adoption of an agency policy"); *see also Taylor Energy Co. LLC v. United States Dep't of Interior Bureau of Ocean Energy Mgmt.*, 271 F. Supp. 3d 73, 95 (D.D.C. 2017) (finding a draft version of a memorandum to be deliberative where it contained comments and redline edits that clearly evinced an intention to express tentative, not final, views).

FGA argues that rather than withholding the entire document, DOJ was required to segregate properly privileged opinions from factual materials and release the document with redactions over the former. (Doc. 52 at 23). While the Court agrees that if there were factual materials contained in the draft document, they would need to be released, *see Buzzfeed, Inc. v. DOJ*, 419 F. Supp. 3d 69, 78 (D.D.C. 2019) ("raw facts with informational value in their own rights" are not exempt from FOIA, even if they are included in a draft document), there is no indication based on the DOJ's description of the document in the *Vaughn* Index or Mr. Kagle's description of the document in his affidavit, that the document contains factual material. Instead, Mr. Kagle stated that "[t]he draft document contains *potential* DOJ actions and *potential* issues related to the implementation of

16

Executive Order 14019." (*See* Doc. 50-2 at ¶ 40) (emphasis added).  The identification of potential actions and issues does not strike the Court as purely factual material, as it instead evinces the "exercises of discretion and judgment calls" typical of the content of documents where Exemption 5 properly applies.  *See Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (explaining that Exemption 5 applies where, as here, "the selection of facts thought to be relevant clearly involves 'the formulation or exercise of . . . policy-oriented *judgment*' or 'the process by which *policy* is formulated'") (emphasis in original).

Mr. Kagle's affidavit provides a clear basis for the application of the deliberative process privilege insofar as it outlines the conjectural nature of the document and does not suggest that there is non-decisional factual material contained therein.  (Doc. 50-2 at ¶ 40).  Because "affidavits can be sufficient for summary judgment purposes in [a] FOIA case," *see Miscavige*, 2 F.3d at 368, so long as they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and [not be] controverted by either contrary evidence in the record not by evidence of agency bad faith," *Larson*, 565 F.3d at 862, the Court finds that the draft document found at *Vaughn* Index Entry 12 was properly withheld under the deliberative process privilege included within Exemption 5.

### ii.    *Vaughn* Index Entries 17 and 51

DOJ also asserts that *Vaughn* Index entries 17 and 51—an email chain with the subject line "RE: Voting EO Meeting"—were properly withheld in part.  (*See*

Doc. 50 at 17–19; Doc. 50-3 at 5, 10).  In the *Vaughn* Index, the DOJ describes

entries 17 and 51 as an "Email chain among CRT attorneys and other Executive

Branch employees.  Withholdings consist of deliberative discussions of legal

research, suggestions, and proposed actions related to the implementation of

Executive Order 14019."  (Doc. 50-3 at 5, 10).  For entry 51, further description is

added that "this email chain is a continuation of the email chain [at entry 17].  As

such, it continues the aforementioned conversation, and contains some duplicative

information also found [at entry 17]."  (*Id.* at 10).  Ms. Brinkmann's declaration

addresses the withheld documents as follows:

> The email chains . . . consist of two iterations of an internal
> DOJ email discussion regarding the Department's
> development of the DOJ Strategic Plan . . . .  Within the
> withheld portions of the emails (which are all internal to
> DOJ), a research question is posed by an ODAG[5]
> employee, and internal deliberations begin as to research
> into resources on voting rights.  These deliberations
> include discussion as to resources relied upon by DOJ
> personnel in crafting the DOJ Strategic Plan, as well as
> legal research conducted for the same purpose.  These
> deliberations further include DOJ commentary and
> feedback on the aforementioned research, made for the
> purpose of weighing potential options and determining
> future action.  Based on the internal research conducted,
> as well as the subsequent deliberations, the emails contain
> recommendations relevant to other components within
> DOJ.

(Doc. 50-4 at ¶¶ 25–26).  In sum, the withheld portions include: (1) a research

question, (2) discussions about resources on voting rights, (3) commentary and

---

[5] Ms. Brinkmann defines "ODAG" as the Office of the Deputy Attorney General.
(Doc. 50-4 at 2).

feedback on resources, and (4) recommendations.  (*Id.*)  All of these materials are pre-decisional in that they were "prepared in order to assist an agency decision maker in arriving at his decision."  *Miccosukee*, 516 F.3d at 1263.  Specifically, all of these materials were prepared prior to, and in furtherance of, the ODAG employee's decision.  *See Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*, 823 F.2d 574, 585 (D.C. Cir. 1987) ("A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates.").

Further, the Court finds that the withheld portions of entries 17 and 51—insofar as they include questions, answers, comments, and recommendations—are deliberative because they "reflect[ ] the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866.  The email chain is therefore a clear example of "communications [that], if revealed, would expose to public view the deliberative process of an agency."  *See Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982).  The Court therefore finds that based on the information in Ms. Brinkman's declaration, Exemption 5 applies to the materials that the DOJ withheld from the email chain because such materials were sent in the midst of a pre-decisional and deliberative process.  *See Miscavige*, 2 F.3d at 368; *Pub. Citizen, Inc. v. United States Dep't of Educ.*, 388 F. Supp. 3d 29, 50 (D.D.C. 2019) (holding that where emails were sent "as a part of a pre-decisional and deliberative process leading to the selection of a focus for [an event]," the redactions in those emails were appropriate under the deliberative process privilege).

19

FGA argues that while "the redacted portions of the emails may contain some opinions that are properly privileged . . . .  DOJ . . . failed to explain its refusal to segregate non-exempt material from the email threads."  (Doc. 52 at 23).  It appears that DOJ did segregate non-exempt material from the email threads, because the withholdings in the email chains were only partial.  First, the descriptions for *Vaughn* Index entries 17 and 51 do not state that the documents were "withheld-in-full" as other entries state.  (*Compare* Doc. 50-3 at 10, *with* Doc. 50-3 at 11).  Ms. Brinkman confirmed this *partial* redaction in her declaration, averring that "the deliberative process privilege [was] applied to . . . *Vaughn* entries 17 and 51, *in part*."  (Doc. 50-4 at ¶ 6) (emphasis added).

Finally, a review of the email production demonstrates that DOJ's redactions omit areas where a staff member offered an opinion on a particular matter.  For example, a July 9, 2021 email in which a DOJ official answers her supervisor's question states, "I looked at the [redacted] . . .  I'm happy to dig more into any of this if it would be helpful—please let me know what you think."  (*See* Doc. 52-2 at 14–15).  There is no indication that the redacted material constitutes anything other than the proposed answer of the junior employee to her supervisor.  This is the archetypal form of communication protected by the deliberative process privilege, insofar as it reflects an advisory opinion, recommendation, or deliberation, tentatively made from a junior employee to her senior.  *See Klamath*, 532 U.S. at 8–9 ("The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a

potential item of discovery and front page news.").

Thus, there is no record evidence supporting a finding that DOJ did not segregate non-exempt material from the email threads. *See Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) ("Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail."). Accordingly, the Court finds that the DOJ properly withheld the portions of internal email communications among DOJ employees regarding DOJ's development of its Strategic Plan under Exemption 5.

### iii.   *Vaughn* Index Entries 53 and 71

DOJ next argues that *Vaughn* Index entries 53 and 71—a Word document email attachment titled, "Meeting with voting rights advocates – 7.13.2021 clean.docx"—were properly withheld in full (entry 71) and in part (entry 53). (*See* Doc. 50 at 19–20; Doc. 50-3 at 10–11).

Specifically, in the *Vaughn* Index, the DOJ describes entries 53 and 71 as a document "consist[ing] of notes that a DOJ employee took during a listening session with stakeholders on voting rights issues in order to inform Executive Branch deliberations on compliance with Executive Order 14019." (Doc. 50-3 at 10–11). For entry 71, the DOJ explains, "[t]his document is duplicative of" the document found at entry 53. (*Id.* at 11). Mr. Kagle explained that *Vaughn* Index entry 53,

> represents notes composed by a Department of Justice representative—Ms. Carrie Pagnucco—while attending a White House Listening Session hosting stakeholders. As Senior Counsel in the CRT's Front Office, Ms. Pagnucco was assigned the role of overseeing DOJ's strategic planning process under EO 14019 . . . . The stakeholder

21

listening session that took place on July 12, 2021, was organized by the Domestic Policy Council. Staff from agencies working on EO implementation were invited to join and hear from stakeholders, who shared their ideas for what federal agencies could do to promote access to voting pursuant to the Executive Order. Ms. Pagnucco was the only person from DOJ who joined the listening session and her notes reflected at Vaughn Index entry 53 were taken in order to share with DOJ colleagues (in CRT's Front Office, OASG[6], and ODAG) and relay the ideas that participants discussed.

(Doc. 50-2 at ¶ 41). Given that entry 71 is "duplicative of" entry 53, the Court understands that Mr. Kagle's description of the entry applies to both entries. The DOJ's redactions in Ms. Pagnucco's notes are substantial, and aside from the names of speakers at the "listening session" and their associated organizations, no other information is provided. (*See* Doc. 52-4 at 2–11).

Certainly, the notes were pre-decisional in that they reflected "ideas for what federal agencies could do to promote access to voting pursuant to the Executive Order," and the notes were meant to be shared with other DOJ colleagues. (Doc. 50-2 at ¶ 41). *See Reps. Comm. for Freedom of the Press v. United States Customs & Border Prot.*, 567 F. Supp. 3d 97, 123 (D.D.C. 2021), *appeal dismissed*, No. 21-5293, 2022 WL 801357 (D.C. Cir. Mar. 15, 2022) ("That a superior might review the notes from the analyst buttresses the predecisional nature of the document.").

Viewing the facts in the light most favorable to the DOJ, the Court cannot determine as a matter of law that the notes were deliberative under Exemption 5.

---

[6] Mr. Kagle's affidavit indicates that OASG is the acronym used for "Office of the Associate Attorney General." (Doc. 50-2 at 6).

That is, if the notes are subjective, reflecting Ms. Pagnucco's views about the matters discussed at the "listening session," then the document might be fairly characterized as deliberative. *Abramyan v. United States Dep't of Homeland Sec.*, 6 F. Supp. 3d 57, 67 (D.D.C. Dec. 4, 2013) (holding that "[i]nsofar as they contain commentary on [a speaker's] credibility and recommendations . . . the handwritten notes are . . . 'quintessentially deliberative'") (quoting *Anguimate v. U.S. Dep't of Homeland Sec.*, 918 F. Supp. 2d 13, 19 (D.D.C. Jan. 24, 2013)).  But if the notes "are a straightforward factual recounting of [the] meeting . . . detailing what each of the participants said," then the notes are factual and not deliberative and were not properly withheld under Exemption 5.  *See Gold Anti-Tr. Action Comm., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 762 F. Supp. 2d 123, 137 (D.D.C. Feb. 3, 2011); *see Abramyan*, 6 F. Supp. 3d at 67 (noting that a "verbatim transcript" of an interview would not be deliberative).

Accordingly, the Court finds that DOJ must produce these documents for *in camera* review.  *See Am. Civil Liberties Union v. U.S. Dep't of Justice*, 90 F. Supp. 3d 201, 216, n.2 (S.D.N.Y Mar. 3, 2015) (explaining that "*in camera* review may be appropriate . . . '[w]hen the dispute turns on the actual contents of the documents' as opposed to 'when the dispute centers . . . on the parties' differing interpretations as to whether the exemption applies to such information").

### iv.   *Vaughn* Index Entry 132

DOJ also argues that *Vaughn* Index entry 132—a Word document email attachment titled, "FIN_Tick Tock for Voting Rights Consultations v2.docx—was

properly withheld in full.  (*See* Doc. 50 at 21–22; Doc. 50-3 at 21–22).  In the *Vaughn* Index, the DOJ describes entry 132 as "an agenda for a consultation meeting on Native American voting rights.  The document contains embedded talking points and options for participants that were not necessarily implemented at the meeting." (Doc. 50-3 at 21).  Mr. Kagle describes the document as:

> a template White House agenda and draft talking points to accompany a White House meeting between Agency Heads and Tribal Leaders on the topic of Voting Rights.  This draft "Tick Tock" was attached to a meeting invitation sent by Tracy Goodluck in the Executive Office of the President to dozens of Agency representatives.  It represents a draft agenda as envisioned by the Executive Office of the President of meetings designed for purposes of assisting the President in his decisionmaking and gleaning constituent input in the process of shaping policies.

(Doc. 50-2 at 16).  The Court finds that there is no genuine issue of material fact that this document was predecisional and deliberative.

First, insofar as the document contained a template White House agenda and draft talking points that were prepared and shared to agency heads *prior to* the meeting at which they were to be used, the Court finds that the document is predecisional.  This is because the agenda and talking points were merely proposals and did not need to be followed as written.  In fact, the agency head attendees to whom the draft agenda and draft talking points were provided could have chosen not to stick to them at all.  *See Am. Ctr. for L. & Just. v. United States Dep't of Just.*, 325 F. Supp. 3d 162, 174 (D.D.C. Sept. 7, 2018) (holding that even final talking points remain predecisional because "given that talking points are typically used on the fly, it would rarely be the case that an official formally adopts" them); *see also*

24

*Leopold v. Off. of Dir. of Nat'l Intel.*, 442 F. Supp. 3d 266, 285 (D.D.C. Feb. 18, 2020)

(finding documents containing "proposed talking points, anticipated questions, and

proposed answers" to be "pre-decisional because they were prepared and shared

prior to the occurrence of a press briefing or any other official communication which

would represent a final decision on [the defendant agency's] official position on the

subject").

The Court also finds that the document found at *Vaughn* Index entry 132 is

deliberative.  Even if the template agenda and draft talking points were followed to

the letter at the White House meeting between agency heads and tribal leaders on

the topic of voting rights, Mr. Kagle's sworn statement that the purpose of the

meeting was to "assist[ ] the President in his decisionmaking and gleaning

constituent input in the process of shaping policies," (Doc. 50-2 at 16), indicates that

the agenda was related to policy development and not-yet-finalized policy decisions.

*See Watkins L. & Advoc., PLLC v. United States Dep't of Veterans Affs.*, 412 F.

Supp. 3d 98, 113 (D.D.C. Sept. 30, 2019) ("Agencies do not have to go so far as

'identif[ying] a specific decision corresponding to each communication,' as long as it

shows that 'the document was generated as part of a definable decision-making

process.'"); *Grand Cent. P'ship*, 166 F.3d at 482 (explaining that considerations

informing whether a record is "deliberative" include "whether the document (i)

formed an essential link in a specified consultative process, (ii) reflects the personal

opinions of the writer rather than the policy of the agency," and "(iii) if released,

would inaccurately reflect or prematurely disclose the views of the agency").  Thus,

25

because the template agenda and draft talking points "reflect[ed] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions" regarding voting rights would be formulated, the draft agenda was deliberative. *See Sears*, 421 U.S. at 150.

The Court therefore finds that the document found at *Vaughn* Index entry 132 was properly withheld in full. *See id.* at 153 (explaining that the deliberative process privilege "calls for . . . the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be").

### v. DOJ's Strategic Plan

Finally, DOJ argues that its Strategic Plan was properly withheld-in-full based on the deliberative process privilege and the presidential communications privilege. (Doc. 50 at 23). The Strategic Plan—whose full title is "STRATEGIC PLAN for the Implementation of Executive Order 14019, Promoting Access to Voting"—is described in the *Vaughn* Index as "the Department of Justice Strategic Plan for implementing Executive Order 14019, as solicited by and submitted to the White House. The strategic plan includes DOJ deliberations regarding potential future actions." (Doc. 50-3 at 22). Ms. Brinkmann explained:

> Consistent with the parameters set forth by the White House in the template for the interim plan provided to agencies soliciting proposed agency actions, the DOJ Strategic Plan highlighted certain DOJ non-enforcement policy actions on voting matters, presented other potential DOJ non-enforcement policy actions for consideration, including potential timelines, budget impact, and possible obstacles and ways to address them. Additionally, the DOJ

> Strategic Plan identified specific non-enforcement policy areas requiring further discussions between DOJ and the White House. The DOJ Strategic Plan was solicited by the White House in order to inform future policy decisions on voting access and to assist the DPC[7] in formulating advice to give to the President in this area.

(Doc. 50-4 at ¶ 14). Ms. Brinkmann added:

> Throughout this process, senior White House advisors read and relied on the DOJ and other strategic plans in formulating advice to the President, and highlights from the DOJ Strategic Plan and other agencies' plans were included in briefing materials provided to the President. This advice, in turn, informed the President on the extent of DOJ and other agency actions and proposals on relevant voting matters, and on areas where further Executive Branch action might be needed or considered within the scope of the President's executive authority. Additionally, this advice informed the President's budgetary decisions, legislative engagement, and his preparation for engagements with external stakeholders.

(*Id.* at ¶ 15).

### a. "Secret Law" Doctrine

FGA argues that under the "secret law" doctrine, DOJ was "categorically bar[red]" from invoking Exemption 5 as to the Strategic Plan, and "the Court accordingly does not need to reach whether executive privileges apply to the Plan." (*See* Doc. 52 at 10–14). To support this argument, FGA cites to section 552(a)(2)(A), (B) of FOIA, which provides:

> (2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format--

---

[7] Ms. Brinkmann defines DPC as "Domestic Policy Council" in her declaration. (*See* Doc. 50-4 at ¶ 7).

> (A) final opinions, including concurring and dissenting
> opinions, as well as orders, made in the adjudication of
> cases;
> (B) those statements of policy and interpretations which
> have been adopted by the agency and are not published in
> the Federal Register[.]

5 U.S.C. § 552(a)(2)(A), (B).  Nowhere, in this text, however, can the Court discern a

categorical ban on the invocation of Exemption 5 where "final opinions" or

"statements of policy and interpretations which have been adopted by the agency"

are present.  As one court held when presented with arguments brought under the

"secret law" doctrine, "there is no textual basis in FOIA for a freestanding 'secret

law doctrine.'  Notwithstanding the [requestor]'s policy arguments, this [c]ourt

declines the invitation to read a 'secret law' exception into the FOIA exemptions

without a statutory tether." *New York Times Co. v. U.S. Dep't of Just.*, 872 F. Supp.

2d 309, 317 (S.D.N.Y. May 17, 2012).

   This Court agrees.  The Supreme Court has cautioned against adopting a

"text-light approach" to interpreting FOIA, particularly where there is "clear

statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 573–74 (2011).  Afterall,

courts "begin with the understanding that Congress 'says in a statute what it

means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co.*

*v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (citing *Connecticut Nat. Bank v.*

*Germain,* 503 U.S. 249, 254 (1992)).  Thus, it is well established that "when the

statute's language is plain, the sole function of the courts—at least where the

disposition required by the text is not absurd—is to enforce it according to its

terms." *Id.*  After a careful reading of Exemption 5's text, the Court declines to hold

that there is a "secret law" exception to the exemption.  The Court instead turns to whether the privileges asserted by DOJ under Exemption 5 apply to the Strategic Plan.

### b. The deliberative process privilege does not apply to the Strategic Plan.

DOJ argues that the deliberative process privilege contained in Exemption 5 applies to DOJ's Strategic Plan.  (Doc. 50 at 22–23).  Specifically, DOJ argues that the Strategic Plan was predecisional because it included "proposed plans," "deliberations," and "anticipated timelines."  (*Id.* at 22).  FGA, however, argues that the Strategic Plan is not predecisional because it was a final plan crafted by the DOJ which constitutes the DOJ's formal policy.  (Doc. 52 at 11–14).  After careful review, the Court agrees with FGA, and finds that Exemption 5's deliberative process privilege does not apply to the Strategic Plan.

As noted above, the deliberative process privilege is rooted in "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news."  *Klamath*, 532 U.S. at 8–9.  But, as the Supreme Court recently noted, "[t]his rationale does not apply . . . to documents that embody a final decision, because once a decision has been made, the deliberations are done."  *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).  As a result, "documents reflecting a final agency decision and the reasons supporting it . . . are not" predecisional.  *Id.* at 785–86.  To decide whether a document communicates a policy on which the agency has settled, the Supreme Court has instructed that:

> courts must consider whether the agency treats the document as its final view on the matter . . . . When it does so, the deliberative process by which governmental decisions and policies are formulated will have concluded, and the document will have real operative effect . . . . In other words, once cited as the agency's final view, the document reflects the consummation of the agency's decisionmaking process and not a merely tentative position . . . . By contrast, a document that leaves agency decisionmakers free to change their minds does not reflect the agency's final decision.

*Id.* at 786.

Here, the undisputed record evidence reflects that the Strategic Plan was the DOJ's finalized answer in response to the White House's directive in Section 3(b) of EO 14019 that, "within 200 days of the date of [the EO], the head of each agency shall submit to the Assistant to the President for Domestic Policy a strategic plan outlining the ways identified under this review that the agency can promote voter registration and voter participation." 86 Fed. Reg. 13624. First, the *Vaughn* Index indicates that the Strategic Plan was sent from "Department of Justice (OASG and CRT)" to "Susan Rice, Assistant to the President of Domestic Policy." (Doc. 50-3 at 22). The document was sent on September 23, 2021, *exactly* 200 days after the President issued EO 14019 (March 7, 2021), such that any later version of the document would have failed to comply with section 3(b) of the Executive Order. (*See id.*); 86 Fed. Reg. 13624.

In light of the Supreme Court's instruction that a court must evaluate the documents "in the context of the administrative process which generated them," the Court finds that here, the fact that the document was sent on the last possible day

30

on which agencies could send their proposals to Ambassador Rice indicates that the Strategic Plan was not an opinion that was subject to change. *See Sears*, 421 U.S. at 138. Given that September 23, 2021 occurred months after the other documents and email communications about EO 14019 identified by DOJ, a factfinder could draw the reasonable inference that the Strategic Plan represented a culmination of those prior communications. (*See* Doc. 50-3 at 4–22).

Further, the title of the document does not include the word "draft" or any other term which might indicate that the document contains provisional or unsettled policy. (*Compare id.* at 22, *with id.* at 12 (identifying "[Draft] CRT memo on IPC to Implement Voting EO.dox")). While not determinative, this failure to label the document as a draft indicates that the Strategic Plan was not an opinion that was subject to change. *See United States Fish & Wildlife Serv.*, 141 S. Ct. at 786 (finding that where the agency identified the documents in question as "drafts," the draft label indicated that the "drafts [we]re what they sound like: opinions that were subject to change" because "[a] draft is, by definition, a preliminary version of a piece of writing subject to feedback and change").

Additionally, Mr. Kagle testified that while the Strategic Plan was "marked Pre-Decisional / Deliberative," after the FOIA Chief corresponded with the Deputy Associate Attorney General in OASG, "[i]t was confirmed that the version provided by the Senior Counsel was indeed the *final* extant copy as submitted via a secure communication pathway to the Executive Office of the President." (Doc. 50-2 at ¶¶ 25, 27) (emphasis added). Finally, DOJ has introduced no evidence that the

Strategic Plan is not already being applied by DOJ, signifying that the process of formulating possible strategies for achieving the goals set out in EO 14019 has concluded at the agency.  Thus, even though the document contains proposed plans and anticipated timelines, the non-final nature of these elements of the document would be consistent with EO 14019's request for a "strategic plan outlining the ways . . .  that the agency can promote voter registration and voter participation."  86 Fed. Reg. 13624.  Any response to this directive would contain "proposed" or "anticipated" elements because the strategic plan is designedly forward-looking. That is, EO 14019 does not ask for a report on the ways the agency *has promoted* voter registration and participation, but instead solicits a plan by which the agency can promote those goals.  In sum, the Strategic Plan was not "prepared in order to assist an agency decision-maker in arriving at his decision," but instead *was* the final decision of OASG and CRT and reflected the policy of the DOJ.  *Moye*, 376 F.3d at 1277.

Accordingly, because the Strategic Plan (1) is not a draft document, (2) represents the culmination of the DOJ's deliberative process as to EO 14019, (3) reflects the DOJ's final determination as to how it can effectuate the goals outlined in EO 14019, (4) does not specifically contemplate further review by the agency after Ambassador Rice received the draft, and (5) appears to be in effect as the DOJ's operative plan to "promote voter registration and voter participation," it is not predecisional.  *See Wisdom v. U.S. Tr. Program*, 232 F. Supp. 3d 97, 120 (D.D.C. Jan. 13, 2017) (holding that "an agency may not cast records as predecisional when

they actually convey what the agency's policymakers have decided"). Thus, the Court finds that the deliberative process privilege does not apply to the Strategic Plan.

### c. There is a genuine dispute of material fact as to whether the presidential communications privilege applies to the Strategic Plan and accordingly, *in camera* review is warranted.

DOJ next asserts that it properly withheld the Strategic Plan in its entirety pursuant to the presidential communications privilege. (*See* Doc. 50 at 10–13). The Court notes, as a threshold matter, that the presidential communications privilege is neither found within the text of the FOIA statute, nor is it found in the text of the Constitution. *See Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021). Instead, the presidential communications privilege arose from the Supreme Court's holding in *United States v. Nixon*—a case which involved a grand jury subpoena for tape recordings of President Nixon's conversations in the Oval Office—wherein the Supreme Court instructed that there is "a presumptive privilege for presidential communications," which is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974). Later, in *Nixon v. Administrator of Gen. Services*, the Supreme Court stated, "the privilege is limited to communications 'in performance of (a President's) responsibilities,' 'of his office,' and made 'in the process of shaping policies and making decisions.'" *Nixon v. Administrator of Gen. Services*, 433 U.S. 425, 447 (1977).

"The privilege covers documents reflecting presidential decisionmaking and

deliberations, regardless of whether the documents are predecisional or not, and it covers the documents in their entirety." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004). And "[t]he privilege extends to the President's immediate advisers because of the need to protect 'candid, objective, and even blunt or harsh opinions,' for . . . '[a] President and those who assist him must be free to explore alternatives . . . and to do so in a way many would be unwilling to express except privately.'" *Id.* at 1115 (quoting *Nixon I*, 418 U.S. at 708).

The purpose of the privilege is to "preserve[ ] the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving v. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008); *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997) (explaining that "the presidential privilege is based on the need to preserve the President's access to candid advice"). "The President can invoke the privilege when asked to produce documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential. If the President does so, the documents become presumptively privileged." *In re Sealed Case*, 121 F.3d at 744. "While the presidential communications privilege and the deliberative process privilege are closely affiliated, the two privileges are distinct and have different scopes. Both are executive privileges designed to protect executive branch decisionmaking, but one applies to decisionmaking of executive officials generally, the other specifically to decisionmaking of the President." *Id.* at 745.

As noted above, DOJ has the burden to prove that a given exemption applies.

*Campbell*, 164 F.3d at 30.  Citing to various portions of Ms. Brinkmann's declaration, DOJ argues that the presidential communications privilege applies because Ambassador Rice solicited and received the Strategic Plan and formulated advice to the President based on those plans.  (Doc. 50 at 11).  Specifically, as Ms. Brinkmann states in her declaration, members of Ambassador Rice's staff, among others from the WHCO, "compiled highlights from the agency strategic plans for Ambassador Rice's use in White House policy formulation and in briefing the President."  (Doc. 50-4 at ¶ 15).  Further, senior White House advisers "informed the President on the extent of DOJ and other agency actions and proposals on relevant voting matters, and on areas where further Executive Branch action might be needed or considered within the scope of the President's executive authority." (*Id.*)  Ms. Brinkmann summarizes OIP's view that the Strategic Plan was covered by the presidential communications privilege because it "was solicited by the White House in order to inform future policy decisions on voting access and to assist the DPC in formulating advice to give to the President on matters of presidential decisionmaking, and was in fact submitted to Ambassador Rice, a senior White House advisor, for this purpose[.]"  (*Id.* at ¶ 24).

There is no dispute that Ambassador Rice's position qualifies her as a "White House adviser with broad and significant responsibility for investigating and formulating the advice to be given to the President."  *Loving*, 550 F.3d at 37 (quotation omitted).  What is disputed, however, is whether the Strategic Plan reflects "presidential decisionmaking and deliberations" and whether the President,

35

or his staff, seemed to have believed that the Strategic Plan "should remain confidential." *In re Sealed Case*, 121 F.3d at 744–45.

> ### i. The cases cited to by DOJ where the presidential communications privilege was properly invoked are readily distinguishable from this case.

To support its argument that the Strategic Plan reflects such decisionmaking and deliberations, DOJ cites two recent cases wherein other district courts found that the presidential communications privilege was properly applied. (*See* Doc. 50 at 12).

In the more recent of these two cases, *New York Times Co. v. Off. of Mgmt. & Budget*, the documents at issue were emails between the Office of Management and Budget's ("OMB") Principal Associate Director for National Security Programs and an Assistant to the President regarding the hold that President Donald J. Trump placed on financial assistance to Ukraine. 531 F. Supp. 3d 118, 122 (D.D.C. Mar. 29, 2021). The emails in question arose after President Trump tasked his assistant with "soliciting, collecting, and relaying information about the United States government's security assistance funding to Ukraine . . . so that he could advise the President about this matter." *New York Times Co. v. Off. Of Mgmt. & Budget*, No. 1:19-cv-3562, (ECF 30-1 at ¶ 12) (September 14, 2020). Specifically, President Trump's assistant confirmed that "because OMB was continually gathering legal and factual information about the scope and duration of the hold on military aid to Ukraine, [he] had specifically requested that [OMB] apprise him of developments in those deliberations because such developments could change the substance of his

36

advice to the President." (*Id.* at ¶ 14). Thus, while none of the emails constituted communications to or from the President, there were statements in some of the emails "that reveal[ed] Presidential communications or deliberations," which the court found to be covered by the privilege. *New York Times Co.*, 531 F. Supp. 3d at 125.

The second case cited to by DOJ, *Buzzfeed, Inc. v. FBI*, involved "materials collected as part of the FBI's supplementary background investigation into then-Judge Brett Kavanaugh." *Buzzfeed, Inc. v. FBI*, 613 F. Supp. 3d 453, 458 (D.D.C. May 7, 2020). This supplemental background investigation was undertaken at the direction of "an authorized official within the White House Counsel's Office" "after allegations of sexual misconduct against then-Supreme Court nominee Brett Kavanaugh became public." *Id.* at 459. There, "[t]he FOIA requests at issue sought 'a copy of the final report sent to the White House and the Senate Judiciary Committee' and '[a]ll interview notes; investigative notes; FD-302s relating or referring to the FBI investigation into allegations leveled against Mr. Kavanaugh.'" *Id.* The *Buzzfeed* court found that the presidential communications privilege applied because the supplemental background investigation "was requested to assist the President 'effectively and faithfully carry out his Article II duties,' in line with the overarching purpose of the privilege." *Id.* at 468 (quoting *Judicial Watch*, 365 F.3d at 1115).

In so finding, the *Buzzfeed* court explained that the WHCO "specifically communicated to the FBI 'that the disclosure of the [supplemental background

investigation file] would inhibit the President's ability to engage in effective communications and decision-making by interfering with the ability of the President to seek and obtain candid information.'" *Id.* The court reasoned that because "the appointment of Supreme Court justices is a core, nondelegable presidential duty specifically enumerated in Article II of the Constitution . . . the critical importance of this function also presents a heightened 'need for confidentiality to ensure that presidential decision-making is of the highest caliber.'" *Id.* (quoting *In re Sealed Case*, 121 F.3d at 750).

The materials requested in *New York Times* and *Buzzfeed* are markedly dissimilar to the Strategic Plan requested by FGA here. First, the emails sought in *New York Times* related to a matter of pressing national security—namely the security assistance funding that the U.S. was providing to a country at war. Meanwhile, the FBI communications requested in *Buzzfeed* were intimately tied with the President's Article II powers and concerned a highly delicate matter— namely a supplemental background investigation predicated on sexual misconduct allegations against a Supreme Court nominee. Furthermore, in both cases, the White House's requests for information were made discretely, out of the public view, through emails drafted by staff on behalf of the President, acknowledging the sensitivity of the matters discussed therein. *See New York Times¸* No. 1:18-cv-2567, (ECF 30-1 at ¶ 56). In these communications, the White House made clear to the appropriate agency that the information requested would be used to inform the formulation of advice to the President. (*See id.* at ¶ 14). And in both cases, there

were clear decisions to be made by the President, and those forthcoming decisions were known to all parties: namely, what to do with respect to (1) national security funding for Ukraine in *New York Times*, and (2) the appointment of then-Judge Kavanagh to the Supreme Court in *Buzzfeed*.

In sum, given the urgency and import of the materials at issue in *New York Times* and *Buzzfeed*, the utility of the presidential communications privilege was readily apparent. *See In re Sealed Case*, 121 F.3d at 750 (explaining that the presidential communications privilege protects "the need for confidentiality to ensure that presidential decision-making is of the highest caliber"); *see also Judicial Watch*, 365 F.3d at 1115 (explaining that the presidential communications privilege allows the President to "effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process"). That is, with respect to information specifically requested by the President related to matters of national security and the appointment of a Supreme Court Justice, the importance of the presidential communications privilege, which is "rooted in constitutional separation of powers principles and the President's unique constitutional role" is at its apex. *See In re Sealed Case*, 121 F.3d at 745.

Based on the summary judgment record before the Court, the Strategic Plan here shares none of these characteristics. The Strategic Plan was drafted in response to a *public*, widely disseminated executive order, which specifically outlined issues, which each agency head should consider in formulating a strategic plan geared towards achieving the executive order's goals. These are:

(i)     ways to provide relevant information in the course
of activities or services that directly engage with the
public—including through agency materials, websites,
online forms, social media platforms, and other points of
public access—about how to register to vote, how to request
a vote-by-mail ballot, and how to cast a ballot in upcoming
elections;

(ii)     ways to facilitate seamless transition from agencies'
websites directly to State online voter registration systems
or appropriate Federal websites, such as Vote.gov;

(iii)     ways to provide access to voter registration services
and vote-by-mail ballot applications in the course of
activities or services that directly engage with the public,
including:

(A) distributing voter registration and vote-by-mail ballot
application forms, and providing access to applicable State
online systems for individuals who can take advantage of
those systems;

(B) assisting applicants in completing voter registration
and vote-by-mail ballot application forms in a manner
consistent with all relevant State laws; and

(C) soliciting and facilitating approved, nonpartisan third-
party organizations and State officials to provide voter
registration services on agency premises[.]

86 Fed. Reg. 13623–24.  Compared to data regarding U.S. Government spending on

military support for a country at war, information unearthed about a Supreme

Court nominee in an FBI background investigation, or confidential conversations in

the Oval Office between a President and his aides during a criminal prosecution, *see*

*Nixon I*, 418 U.S. at 703, an agency's plans for improving its website and social

media presence, distributing voter registration forms, and providing voter

registration services are simply not akin to the type of "high-level communications"

critical to ensuring that the President may "effectively and faithfully carry out his

Article II duties," *Judicial Watch*, 365 F.3d at 1115.  Given that "[c]onfidentiality is

the touchstone of the privilege, for '[c]onfidentiality is what ensures the expression

of candid, objective, and even blunt or harsh opinions' and the comprehensive exploration of all policy alternatives before a presidential course of action is selected," the Court, viewing the evidence in the light most favorable to the DOJ, cannot find as a matter of law that DOJ properly withheld the Strategic Plan pursuant to the presidential communications privilege at this juncture. *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 24–25 (D.D.C. Dec. 17, 2013) (quoting *In re Sealed Case,* 121 F.3d at 750).

> **ii.    The record is devoid of evidence indicating that anyone in the White House believed, until the FGA's FOIA request, that the Strategic Plan should remain confidential.**

Further, nowhere in Ms. Brinkmann's declaration does she state explicitly that the Strategic Plan is confidential or that "the President believes [the Strategic Plan] should remain confidential." *In re Sealed Case*, 121 F.3d at 744. Instead, she merely states that the purpose of the presidential communications privilege is to ensure that the President is "able to receive confidential advice of all kinds, from a variety of sources" and that the release of the Strategic Plan "would impose a significant chilling effect on presidential decisionmaking, as it would hinder the ability of the President and senior presidential advisors to obtain frank, unfettered information and advice from" DOJ. (Doc. 50-4 at ¶ 17). But the basic contours of the Strategic Plan *were known to the public* well before the Strategic Plan was made, insofar as the agencies were directed by section 3(a) of EO 14019 to include each of the above-quoted issues in their "evaluat[ion of the] ways in which the agency can, as appropriate and consistent with applicable law, promote voter

registration and voter participation." 86 Fed. Reg. 13623. That is, the decision to

"promot[e] access to voting" had already been made by the President by virtue of the

issuance of EO 14019, and the topics that the agencies were asked to cover in their

evaluations of ways to promote access to voting were already outlined in Section

3(a). The fact that the framework, goal, and issues to be considered in the Strategic

Plan were already decided by the White House in a public manner indicates that

the information and advice given to the President through DOJ's Strategic Plan

would not be very "frank" and "unfettered" to begin with. Nor would the Strategic

Plan's utility to the President's decision-making about "promoting access to voting"

be particularly robust insofar as it post-dated the President's determination that:

> Free and fair elections that reflect the will of the American
> people must be protected and defended. But many
> Americans, especially people of color, confront significant
> obstacles to exercising that fundamental right . . . . It is
> the policy of my Administration to promote and defend the
> right to vote for all Americans who are legally entitled to
> participate in elections. It is the responsibility of the
> Federal Government to expand access to, and education
> about, voter registration and election information, and to
> combat misinformation, in order to enable all eligible
> Americans to participate in our democracy . . . . Agencies
> shall consider ways to expand citizens' opportunities to
> register to vote and to obtain information about, and
> participate in, the electoral process.

86 Fed. Reg. 13623. In sum, a trier of fact could reasonably find that the President

did not believe that the Strategic Plan "should remain confidential" because the

policy prescriptions to be embodied in the Strategic Plan were made public in EO

14019. *Judicial Watch*, 913 F.3d at 1111; *see also Ctr. for Effective Gov't*, 7 F. Supp.

3d at 26 (where the "fact sheet" associated with a purportedly confidential

communication was released to the public and "described in detail the goals and initiatives set forth therein," the court found that "the widely publicized nature of [the document] is important in considering the confidentiality interests implicated by the directive's disclosure under FOIA").

In fact, at least one other agency which was directed to craft a Strategic Plan under EO 14019 apparently did not believe that its Strategic Plan was confidential because it made its Strategic Plan available to the public. Specifically, on August 8, 2021, the Department of Defense ("DOD") published a document titled, *Federal Voting Assistance Program Strategic Plan 2021–2025*, on its website, stating, "[i]n response to Executive Order 14019, 'Promoting Access to Voting,' March 10, 2021, FVAP adjusted its strategic plan to reflect . . . the need to increase overall voter awareness for all individuals affiliated with the Department and those receiving assistance." *See* DOD, *Federal Voting Assistance Program Strategic Plan 2021– 2025*, at 2, https://www.fvap.gov/uploads/FVAP/Policies/StratPlan_20210802.pdf (last accessed August 25, 2023). And indeed, the DOD's Strategic Plan discusses many of the issues outlined by the White House in section 3(a) of EO 14019. Thus, a genuine dispute of material fact exists as to whether the White House (or the agencies in the Executive Branch) believed that each agency's Strategic Plan should remain confidential, and the Court cannot determine as a matter of law that DOJ's withholding was proper. *See Nixon I*, 418 U.S. at 707 (holding that privileging presidential communications "on no more than a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset

the constitutional balance of a 'workable government' and gravely impair the role of the courts under Article III").

> ### iii. Ms. Brinkmann's sworn statements regarding the role of the Strategic Plan in guiding presidential decisionmaking are contradicted by the record evidence.

The Court next finds that a trier of fact could reasonably find that the Strategic Plan was unrelated to presidential decisionmaking. As quoted in full above, Ms. Brinkmann stated that the President and his staff would use the document to inform future policy decisions on voting access. Specifically, Ms. Brinkmann asserted that "the DOJ Strategic Plan was solicited by the White House in order to inform future policy decisions on voting access and to assist the DPC in formulating advice to give to the President in this area." (Doc. 50-4 at ¶ 14). Ms. Brinkmann added that the DOJ Strategic Plan "informed the President's budgetary decisions, legislative engagement, and his preparation for engagements with external stakeholders." (*Id.* at ¶ 15). These statements lack sufficient detail and are contradicted by the record evidence.[8]

---

[8] DOJ's apparent efforts to expand the presidential communications privilege from its origin—protecting recordings of President Nixon discussing confidential matters with aides in the Oval Office—to protecting any document solicited and received by White House advisers and their staff are concerning. It cannot be that every document that is received by the President's immediate White House advisers and their staff is protected by the presidential communications privilege so long as those advisers and their staffs may, at some point, rely on the document to brief the President on some matter. Were that the policy, agencies could elide FOIA's congressionally enacted purpose—to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," *see Morley v. C.I.A.*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)—and withhold any document merely by sending it to any White House adviser or their staff.

First, there is no text in EO 14019 suggesting a give and take process between agencies and the White House as to the information contained in the Strategic Plan. Nowhere in EO 14019 is the word "advice" or "recommendation" used with respect to the Strategic Plan, nor is there any indication from the text of EO 14019 that the White House would be giving feedback to the agency on their planned course of action. This is notable because elsewhere in EO 14019 the term "recommendation" is used to direct other entities within the Executive Branch to conduct specific tasks in furtherance of the goals outlined in EO 14019.

For example, section 10(d) states that the Native American Voting Rights Steering Group "shall produce a report within 1 year of the date of this order outlining recommendations for" protecting the voting rights of Native Americans. 86 Fed. Reg. 13626. And section 6(a) states that the Director of the Office of Personnel Management shall, within 200 days of the date of EO 14019, "coordinate with the heads of executive agencies . . . to provide recommendations to the President . . . on strategies to expand the Federal Government's policy of granting employees time off to vote." *Id.* at 13625. These sections of EO 14019, which solicit "recommendations" not "strategic plans" are notably far more open-ended than section 3(a) and section 3(b) in that they do not contain long lists of issues to be considered, and they do not request a particular format in which such issues are to be addressed.

Second, Ms. Brinkmann's statement that the Strategic Plan "informed the President's budgetary decisions, legislative engagement, and his preparation for

engagements with external stakeholders" is so lacking in detail that the Court cannot possibly find that DOJ has met its burden of proving the applicability of Exemption 5 on this assertion alone.  (*See* Doc. 50-4 at ¶ 15).  "Legislative engagement" is a vague, undefined term that could mean anything from actually making decisions on voting rights legislation proposed by Congress to posting a press release about the Biden Administration's voting rights initiatives on social media.  The same is true of "engagements with external stakeholders" which could be deliberative, brainstorming sessions between the President and third-party organizations focused on voting rights or photo opportunities with voters.

Finally, even if the Strategic Plan had an advisory purpose with respect to the President's "budgetary decisions," the OMB released the FY 2023 budget in 2022, indicating that the budgetary advice included in the Strategic Plan has been distributed extensively such that "the purposes animating the privilege"—namely "candor and confidentiality"—"will not justify its application."  *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26, 29.  Specifically, the FY 2023 budget allocated $367 million to DOJ for "civil rights protection[,]" including the "enforcement of voting rights[,]" as well as "expand[ing] investigations of election-related crimes, including voter suppression."  *Off. of Mgmt. & Budget, Budget of the U.S. Government Fiscal Year 2023*, 81–82 (2022) (available at https://www.whitehouse.gov/wp-content/uploads/2022/03/budget_fy2023.pdf).  Thus, DOJ's "submissions have not adequately explained how the information contained within the withheld documents differs from the information that the Administration has publicly

disseminated." *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. United States Dep't of State*, No. 17 CIV. 7520 (PGG), 2019 WL 10984173, at *7 (S.D.N.Y. Mar. 29, 2019).

Given the lack of clarity surrounding the Strategic Plan's purportedly advisory role, the Court finds that a reasonable interpretation of section 3(b) would be that the White House is requesting the agencies to report on their intended plans, thereby assuring agency compliance with, and promotion of, the goals of EO 14019. This reading is also consistent with Ms. Brinkmann's sworn statement. There, Ms. Brinkmann states that members of Ambassador Rice's staff "compiled highlights from the agency strategic plans" and used these highlights to brief the President "on the extent of DOJ and other agency actions and proposals on relevant voting matters[.]" (Doc. 50-4 at ¶ 15). Thus, a plausible understanding of the role of the Strategic Plan in the President's work to promote access to voting could be that the Strategic Plan provided assurance to the White House that the expansive complex of agencies and officials operating under the Executive Branch were acting in unison to accomplish the President's goals, *not* that the strategic plans provided recommendations or advice to the President. The Court therefore cannot find based on the evidence before it that the Strategic Plan constitutes an aspect of presidential decision-making. *See Judicial Watch*, 365 F.3d at 1118 ("Extending the presidential communications privilege to cover . . . internal [DOJ] documents would be both contrary to executive privilege precedent and considerably undermine the purposes of FOIA to foster openness and accountability in government.").

Because "[i]n FOIA cases, summary judgment may [not] be granted on the basis of agency affidavits if they [do not] contain reasonable specificity of detail . . . and if they are [ ] called into question by contradictory evidence in the record," *Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017), the Court will not grant summary judgment in favor of DOJ here.  Simply put, the Court is not convinced based on the caselaw identified by DOJ, and the Court's careful review of the record evidence, that "[t]he Strategic Plan . . . falls squarely within the scope of the presidential communications privilege" because it "reflects presidential decisionmaking and deliberations," as DOJ asserts.  (Doc. 50 at 12).

Instead, the Court concludes that *in camera* review of the Strategic Plan is the appropriate means to resolve the parties' dispute.  *See Quinon v. F.B.I.*, 86 F.3d 1222, 1228 (D.C. Cir. 1996) ("[*I*]*n camera* review may be particularly appropriate when . . . the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency.").  While the Court is aware that another district court recently found at the summary judgment stage that the presidential communications privilege applies to EO 14019, *see Am. First Legal Found. v. U.S. Dep't of Agric.*, No. CV 22-3029 (BAH), 2023 WL 4581313 (D.D.C. July 18, 2023), the Court, for the reasons explained, cannot draw the same conclusion.  As the Supreme Court noted in *Nixon I*:

> Absent a claim of need to protect military, diplomatic, or sensitive national security secrets, we find it difficult to accept the argument that even the very important interest in confidentiality of Presidential communications is significantly diminished by production of such material for *in camera* inspection with all the protection that a district

48

court will be obliged to provide.

*Nixon I*, 418 U.S. at 706; *see also Am. Civil Liberties Union v. Dep't of Justice*, No. 15 CIV. 1954 (CM), 2016 WL 889739, at *5 (S.D.N.Y. Mar. 4, 2016) (ordering *in camera* review of "Presidential Policy Guidance" where "it is certainly possible that the claimed [presidential communications] privilege applies[,] [b]ut the court does not know how widely the document has been distributed, or to whom, ... [or] whether any part of it ... closely tracks the information that was [publicly] disclosed").

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** FGA's Motion for Summary Judgment to the extent that it requests that the Court order *in camera* review of the Strategic Plan to determine the applicability of the presidential communications privilege.

The Court further **GRANTS** FBA's motion for summary judgment and orders *in camera* review of *Vaughn* Index entries 53 and 71 to determine the applicability of the deliberative process privilege.

The Court **DENIES** with prejudice FGA's Motion for Summary Judgment to the extent that it argues that DOJ violated FOIA by applying Exemption 5 to the documents found at *Vaughn* Index entries 12, 17, 51, and 132.

The Court also **GRANTS** DOJ's Motion for Summary Judgment to the extent that it argues that it did not violate FOIA by applying Exemption 5 to the documents found at *Vaughn* Index entries 12, 17, 51, and 132.

The Court **DENIES without prejudice** DOJ's Motion for Summary Judgment to the extent that it argues that it did not violate FOIA by applying Exemption 5 to the Strategic Plan and to the documents found at *Vaughn* Index entries 53 and 71.

On or before September 8, 2023 DOJ will provide the Court with copies of the documents identified in *Vaughn* Index entries 53 and 71, as well as the Strategic Plan identified in the *Vaughn* Index such that the Court can conduct an *in camera* review to evaluate the DOJ's stated justifications for withholding disclosure of those documents to FGA.

**ORDERED** at Fort Myers, Florida on August 25, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE