## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### Fort Myers Division

|  |  |  |
|---|---|---|
| THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY, | ) ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 2:22-cv-00252-JLB-MRM |
| v. | ) ) ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) ) ) | |
| *Defendant*. | ) ) | |

## DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF UNDISPUTED FACTS ...........................................................2

STANDARD OF REVIEW ...................................................................................5

ARGUMENT ........................................................................................................5

I.  DOJ properly withheld its Strategic Plan in its entirety under FOIA
    Exemption 5, based upon the presidential communications privilege..............7

   a. Background law ...........................................................................................7

   b. Immediate White House adviser with broad and significant responsibility on
      voting rights issues ....................................................................................9

   c. Presidential decision-making and deliberations .........................................10

   d. Intended and actual confidentiality ...........................................................14

   e. Foreseeable harm ......................................................................................18

II. DOJ properly withheld portions of its Strategic Plan under FOIA Exemption
    5, based upon the deliberative process privilege. ..........................................19

   a. Background law ........................................................................................19

   b. Predecisional ............................................................................................20

   c. Deliberative ..............................................................................................22

   d. Foreseeable harm ......................................................................................23

CONCLUSION ...................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Aguiar v. Drug Enf't Admin.*,
  865 F.3d 730 (D.C. Cir. 2017) .......................................................................5, 12

*Am. Ctr. for L. & Just. v. U.S. Dep't of State*,
  330 F. Supp. 3d 293 (D.D.C. 2018) .....................................................................8

*Am. First Legal Found. v. U.S. Dep't of Agric.*,
  No. CV 22-3029 (BAH), 2023 WL 4581313 (D.D.C. July 18, 2023)........ 10, 15, 16

*Brayton v. Off. of the U.S. Trade Representative*,
  641 F.3d 521 (D.C. Cir. 2011) ..............................................................................5

*Buzzfeed, Inc. v. FBI*,
  613 F. Supp. 3d 453 (D.D.C. May 7, 2020).........................................................10

*Campaign Legal Ctr. v. U.S. Dep't of Just.*,
  34 F.4th 14 (D.C. Cir. 2022) ...............................................................................19

*Center for Effective Government v. United States Department of State*,
  7 F. Supp. 3d 16 (D.D.C. 2013) ..........................................................................16

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*,
  584 F. Supp. 2d 65 (D.D.C. 2008) ........................................................................8

*Elec. Priv. Info Ctr. v. U.S. Dep't of Just.*,
  18 F.4th 712 (D.C. Cir. 2021) ...............................................................................5

*FTC v. Grolier Inc.*,
  462 U.S. 19 (1983)...........................................................................................6, 22

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ......................................................................*passim*

*Judicial Watch, Inc. v. Dep't of Energy*,
  412 F.3d 125 (D.C. Cir. 2005) ..............................................................................6

*Judicial Watch, Inc. v. Dep't of Just.*,
  365 F.3d 1108 (D.C. Cir. 2004) ..........................................................................11

*Judicial Watch, Inc. v. U.S. Dep't of Defense*,
  913 F.3d 1106 (D.C. Cir. 2019) ..........................................................................16

*Judicial Watch, Inc. v. U.S. Dep't of State*,
  282 F. Supp. 3d 338 (D.D.C. 2017) ...................................................22

*Loving v. Dep't of Def.*,
  496 F. Supp. 2d 101 (D.D.C. 2007) ...................................................8

*Loving v. Dep't of Def.*,
  550 F.3d 32 (D.C. Cir. 2008) ...................................................*passim*

*Miccosukee Tribe of Indians of Florida v. United States*,
  516 F.3d 1235 (11th Cir. 2008) ........................................... 6, 19, 22

*Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.*,
  376 F.3d 1270 (11th Cir. 2004) ........................................... 19, 20, 23

*New York Times Co. v. Off. of Mgmt. & Budget*,
  531 F. Supp. 3d 118 (D.D.C. 2021) ...................................................10

*Nixon v. Administrator of Gen. Servs.*,
  433 U.S. 425 (1977) ...................................................13

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) ...................................................20

*Protect Democracy Project, Inc. v. National Security Agency*,
  10 F.4th 879 (D.C. Cir. 2021) ................................................... 8, 16

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
  421 U.S. 168 (1975) ...................................................19

*Russell v. Dep't of the Air Force*,
  682 F.2d 1045 (D.C. Cir. 1982) ...................................................20

*United States v. Nixon*,
  418 U.S. 683 (1974) ...................................................7

*United States v. Weber Aircraft Corp.*,
  465 U.S. 792 (1984) ...................................................6

*Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*,
  No. 18-2622 (ABJ), 2021 WL 4502106 (D.D.C. Sept. 30, 2021) ........................18

**Statutes**

5 U.S.C. § 552(a)(8)(A)(i) ...................................................7

5 U.S.C. § 552(b)(5) ...........................................................................................3, 6

Pub. L. No. 114-185, 130 Stat. 538 (2016) ...............................................................7

**The Constitution**

U.S. Const., art. II, § 3 ............................................................................................11

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................5

**Regulations**

86 Fed. Reg. 13,623 (Mar. 7, 2021) ................................................................ 2, 9, 15

**Other Authorities**

*Readout of Vice President Kamala Harris's Convening With Voting Rights Leaders*, White House (Feb. 27, 2024), https://perma.cc/Q69P-735Y ........................................13

DOD, *Federal Voting Assistance Program Strategic Plan 2021–2025*, https://perma.cc/UF36-DWZ8 ..........................................................................17

# INTRODUCTION

A single document remains in dispute in this Freedom of Information Act ("FOIA") case—the Strategic Plan that DOJ submitted confidentially to the White House at the President's request in accordance with Executive Order ("EO") 14019. Plaintiff, the Foundation for Government Accountability ("FGA"), argues that Defendant, the U.S. Department of Justice ("DOJ"), improperly withheld its Strategic Plan under FOIA Exemption 5.  But the withholding of the Plan in full based on the presidential communications privilege was entirely proper, as was the overlapping withholding of portions of the Plan under the deliberative process privilege.  The President's solicitation of strategic plans from all federal agencies in EO 14019; the confidential submission of these plans to the head of the Domestic Policy Council (a key presidential advisor on voting access issues); the White House's subsequent use of the plans to guide presidential advice and decision-making; and the intended and actual confidential treatment of those plans by both agencies and the White House all support the applicability of the presidential communications privilege.  Separately, some of the proposals in DOJ's Strategic Plan were merely ideas for potential future actions, which DOJ had not decided upon and still has not implemented.  The deliberative process privilege is therefore applicable to those portions of the Plan.  Because the Plan was properly withheld under FOIA Exemption 5 based on both of those privileges, the Court should grant summary judgment to DOJ.

## STATEMENT OF UNDISPUTED FACTS

1.  President Biden issued EO 14019 on March 7, 2021.  Among other things, the Order directed the "head of each agency" to "evaluate ways in which the agency can, as appropriate and consistent with applicable law, promote voter registration and voter participation" and identified several categories of potential initiatives for federal agencies to consider.  86 Fed. Reg. 13,623, 13,624, § 3(a) (Mar. 7, 2021).  The Order then required each agency to submit a strategic plan to the White House within 200 days outlining "ways identified under this review that the agency can promote voter registration and voter participation."  *Id.* § 3(b).

2.  The Order directed agencies to submit their strategic plans to "the Assistant to the President for Domestic Policy," who at relevant times was Ambassador Susan E. Rice, also Director of the White House Domestic Policy Council.  *Id.*  Agencies submitted these plans to Ambassador Rice via a "secure, online password-protected portal to which only certain White House staff had access."  Decl. of Richard A. Sauber ¶ 11 , ECF No. 68-1 ("Sauber Decl.").

3.  FGA submitted a FOIA request to DOJ's Civil Rights Division ("CRT") on July 30, 2021, requesting records related to the implementation of EO 14019.  *See* Compl. for Declaratory and Inj. Relief ¶ 17, ECF No. 1 ("Compl.").

4.  FGA requested five categories of records, including DOJ's "strategic plan developed pursuant to [EO 14019]."  *Id.*, Ex. B at 1, ECF No. 1-2.

5.   FGA filed this suit on April 20, 2022, because it had not yet received any records responsive to its FOIA request from CRT.  Compl. ¶ 1.

6.   Thereafter, CRT informed FGA that it had located approximately 5,500 records that were potentially responsive to FGA's FOIA request.  *See* Uniform Case Management Report at 10, ECF No. 24.

7.   The Court ordered CRT to process and produce all responsive, non-exempt records within approximately two months.  Scheduling Order, ECF No. 31.

8.   CRT produced the responsive, non-exempt records on September 8, 2022.  *See* ECF No. 35.  CRT later re-produced two documents with discretionary releases of portions of previously withheld information and produced, as a discretionary matter, one document that had previously been deemed unresponsive.  *See* Joint Status Report at 2-3, ECF No. 49; Decl. of Kilian Kagle ¶ 35, ECF No. 50-2 ("Kagle Decl.").

9.   In total, CRT located 153 pages of responsive records.  Of these, CRT produced the responsive, non-exempt records and portions thereof to FGA and withheld either in full or in part records for which FOIA Exemptions 5 and/or 6 applied.  *See* 5 U.S.C. §§ 552(b)(5), (b)(6).

10.  FGA challenged the assertion of Exemption 5 over seven documents.  *See* Pl.'s Cross-Mot. for Summ. J. and, Alternatively, for *In Camera* Inspection and Limited Discovery and Opp'n to Def.'s Mot. for Summ. J. at 21-23, ECF No. 52 ("Pl.'s Cross-MSJ").

11. In its August 25, 2023, Order, this Court granted DOJ's motion for summary judgment as to the lawfulness of the withholdings under Exemption 5 with respect to four of the challenged documents. Order at 49, ECF No. 67.

12. This Court denied, without prejudice, DOJ's motion for summary judgment with respect to the remaining challenged documents—DOJ's Strategic Plan (withheld in full) and two copies of notes taken by a DOJ employee during a listening session (withheld in part), *id.* at 12, 21-23, 49. The court ordered *in camera* review of those documents "to evaluate the DOJ's stated justifications for withholding disclosure of those documents to FGA." *Id.* at 50.

13. On September 8, 2023, concurrent with its submission of the three documents for *in camera* review, DOJ moved for leave to file a supplemental declaration in support of its withholding of its Strategic Plan. Def.'s Mot. for Leave to File a Suppl. Decl. at 1, ECF No. 68. The Court granted this motion on December 14, 2023. Text Order, ECF No. 71.

14. On March 4, 2024, the Court completed its *in camera* review of the documents that DOJ submitted and granted DOJ leave to submit a renewed motion for summary judgment as to those documents. Text Order, ECF No. 73.

15. On March 20, 2024, DOJ conveyed a discretionary release of the two copies of the listening session notes (*Vaughn* entries 53 and 71) to Plaintiff's counsel.

16.   As expressed in the declarations of Kilian Kagle, the Chief of the FOIA Unit of CRT; Vanessa Brinkmann, Senior Counsel in the Office of Information Policy at DOJ; Richard A. Sauber, Special Counsel to the President in the White House Counsel's Office; and the *Vaughn* Index, DOJ maintains that the challenged withholding of the Strategic Plan under Exemption 5 was appropriate.  *See* Kagle Decl.; Decl. of Vanessa Brinkmann, ECF No. 50-4 ("Brinkmann Decl."); Ex. A, Second Decl. of Vanessa Brinkmann ("Second Brinkmann Decl."); Sauber Decl.; *Vaughn* Index, ECF No. 50-3.

## STANDARD OF REVIEW

Most FOIA cases are resolved on summary judgment.  *See Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In a FOIA case, a court may base its grant of summary judgment "on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith."  *Aguiar v. Drug Enf't Admin.*, 865 F.3d 730, 734-35 (D.C. Cir. 2017) (citation omitted).  "[A]n agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates that each document that falls within the class requested either has been produced or is wholly exempt from FOIA's inspection requirements."  *Elec. Priv. Info Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 717 (D.C. Cir. 2021) (cleaned up).

## ARGUMENT

FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."[1]  5 U.S.C. § 552(b)(5).  In other words, Exemption 5 incorporates civil litigation privileges.  Unlike in civil litigation, however, a court must determine only whether the information at issue would "routinely" be disclosed in civil litigation; if not, the information is exempt from disclosure.  *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984) (citation omitted).  Accordingly, for privileges that in civil litigation would be qualified, such that a plaintiff could defeat them upon a showing of sufficient need, no such balancing is undertaken under FOIA.  *FTC v. Grolier Inc.*, 462 U.S. 19, 28 (1983).  To properly withhold a record, an agency need only make a threshold showing that the record would ordinarily be protected a privilege, including the deliberative process or presidential communications privileges.  *See Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008); *Miccosukee Tribe of Indians of Florida v. United States*, 516 F.3d 1235, 1263 (11th Cir. 2008).

In addition to showing that a withholding meets an applicable FOIA exemption, DOJ must show that it "reasonably foresees that disclosure [of any of the withholdings] would harm an interest protected by an exemption" or that "disclosure

---

[1] "[D]ocuments prepared by agency officials to advise the President [a]re within the coverage of Exemption 5 because they [a]re 'intra-agency or inter-agency memoranda or letters that [are] used in the decisionmaking processes of the Executive Branch.'") *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005); *see* Brinkmann Decl. ¶ 11.

is prohibited by law." Pub. L. No. 114-185, 130 Stat. 538, 539 (2016) (codified at 5 U.S.C. § 552(a)(8)(A)(i)). DOJ has made both showings here.

## I. DOJ properly withheld its Strategic Plan in its entirety under FOIA Exemption 5, based upon the presidential communications privilege.

### a. Background law

The "presumptive privilege for Presidential communications" is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 706, 708 (1974). This privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving*, 550 F.3d at 37 (citations omitted). It follows from the core constitutional principle that the "President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708.

The privilege applies not only to "communications directly involving and documents actually viewed by the President," but also encompasses "documents solicited and received by the President or his immediate White House advisers with broad and significant responsibility for investigating and formulating the advice to be given the President." *Loving*, 550 F.3d at 37 (cleaned up). These documents are privileged when they "reflect[] presidential decisionmaking and deliberations" and

7

are intended to "remain confidential."[2]   *In re Sealed Case*, 121 F.3d 729, 744

(D.C. Cir. 1997); *see also Protect Democracy Project, Inc. v. National Security Agency*,

10 F.4th 879, 885 (D.C. Cir. 2021) (discussing *In re Sealed Case* and reaffirming that

the privilege attaches to "records of nonpublic presidential communications").

The presidential communications privilege "applies to documents in their

*entirety*, and covers final and post-decisional materials as well as pre-deliberative

ones"; accordingly, no segregability analysis is required.   *In re Sealed Case*, 121 F.3d

at 745 (emphasis added).   The privilege is thus "broader than its deliberative process

cognate."   *Protect Democracy Project*, 10 F.4th at 885-86.   And because the presidential

communications privilege is "rooted in constitutional separation of powers principles

and the President's unique constitutional role," judicial negation of the privilege is

---

[2]   *In re Sealed Case* describes the confidentiality element of the presidential communications privilege as covering material that "*the President believes* should remain confidential,"121 F.3d at 744 (emphasis added), but because that case occurred in the context of a grand jury subpoena, it was essential that the President personally invoke the privilege.   In contrast, in a FOIA suit there is no need for a personal invocation of the presidential communications privilege by the President. *See, e.g.*, *Am. Ctr. for L. & Just. v. U.S. Dep't of State*, 330 F. Supp. 3d 293, 308 (D.D.C. 2018) ("[E]ven assuming that the President must personally invoke the presidential communications privilege in civil discovery, . . . this requirement is not imported into the far different context of FOIA.") (cleaned up); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 584 F. Supp. 2d 65, 80 (D.D.C. 2008) ("There is no indication in the text of FOIA that the decision to withhold documents pursuant to Exemption 5 must be made by the President"); *Loving v. Dep't of Def.*, 496 F. Supp. 2d 101, 108 (D.D.C. 2007) ("personal invocation [of the presidential communications privilege] is not required as to FOIA requests"), *aff'd*, *Loving*, 550 F.3d 32 (D.C. Cir. 2009).   Thus, the confidentiality element of the privilege in the FOIA context is best understood as a question of whether the document in question was intended to remain confidential, rather than whether the President himself has stated that belief.

"subject to greater scrutiny than denial of the [common-law] deliberative privilege." *In re Sealed Case*, 121 F.3d at 745.

### b. Immediate White House adviser with broad and significant responsibility on voting rights issues

Here, DOJ's Strategic Plan was "solicited [by the President] and received by the President['s] . . . immediate White House adviser[] with broad and significant responsibility for investigating and formulating the advice to be given the President" regarding voting rights issues. *Loving*, 550 F.3d at 37 (cleaned up); *see* Brinkmann Decl. ¶ 16. The President expressly solicited the creation of the Strategic Plan in EO 14019. 86 Fed. Reg. at 13,623 § 3(b). And as this Court previously held, the individual to whom the Strategic Plan was submitted—the Assistant to the President for Domestic Policy and head of the White House Domestic Policy Council (DPC), Ambassador Susan A. Rice—meets the definition of "a 'White House adviser with broad and significant responsibility for investigating and formulating the advice to be given to the President.'" Order at 35 (quoting *Loving*, 550 F.3d at 37). The declarations and the text of EO 14019 make clear that Ambassador Rice was directly responsible for formulating advice to the President based on the strategic plans submitted by DOJ and other agencies. Sauber Decl. ¶ 7, 9-10; Brinkmann Decl. ¶¶ 7, 14; 86 Fed. Reg. at 13,623 § 3(b). She and her staff reviewed DOJ's Strategic Plan, along with the plans from other federal agencies, and she then advised the President based on those plans in order to "inform[] the President on the extent of agency actions and proposals on relevant voting matters and on areas where

further Executive Branch action might be needed or considered within the scope of the President's authority." Sauber Decl. ¶ 7; *see* Brinkmann Decl. ¶ 15.

### c. Presidential decision-making and deliberations

DOJ's Strategic Plan "reflects presidential decisionmaking and deliberations." *In re Sealed Case*, 121 F.3d at 744; *see* Order at 34-36; *see also Am. First Legal Found. v. U.S. Dep't of Agric.*, No. CV 22-3029 (BAH), 2023 WL 4581313, at *9 (D.D.C. July 18, 2023) ("[T]he strategic plans were solicited by the President [in EO 14019] to inform his administration's policymaking on expanding voting access and [are] directly relevant for the presidential decision-making process."). In its previous opinion, this Court undertook to consider "the urgency and import of the materials at issue" in this case as compared to those at issue in two presidential communications privilege FOIA cases that DOJ briefly cited in its first motion for summary judgment. *See* Order at 39; Def.'s Mot. for Summ. J. at 12, ECF No. 50 (citing *New York Times Co. v. Off. of Mgmt. & Budget*, 531 F. Supp. 3d 118, 129 (D.D.C. 2021) and *Buzzfeed, Inc. v. FBI*, 613 F. Supp. 3d 453, 467 (D.D.C. May 7, 2020)). This Court stated that "the utility of the presidential communications privilege was readily apparent" in those cases because the subject matters of the communications—"matters of national security and the appointment of a Supreme Court Justice"—were so "urgen[t] and import[ant]." Order at 39. The Court further stated that the goals of EO 14019, to which the Strategic Plan responded, were not "akin to the type of 'high-level communications' critical to ensuring that the

10

President may 'effectively and faithfully carry out his Article II duties.'" *Id.* at 40 (quoting *Judicial Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1115 (D.C. Cir. 2004)).

But the applicability of the presidential communications privilege does not turn on how important or high-profile the subject matter of a presidential communication is. Neither *New York Times* nor *Buzzfeed* imposes such a requirement, and no appellate authority of the D.C. Circuit or the Eleventh Circuit requires it. Rather, the critical inquiry remains whether the document at issue "reflect[s] presidential decisionmaking and deliberations." *In re Sealed Case*, 121 F.3d at 744. While Article II mentions some duties in detail, such as the nomination of Supreme Court justices, it also grants the President general powers to make policy recommendations and "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. The strategic plans that the President solicited through EO 14019 bear on presidential decisions surrounding one of the Biden administration's "top domestic [policy] priorities"—promoting access to voting. Sauber Decl. ¶ 5. Communications reflecting the President's decision-making and deliberations about policy surrounding access to voting implicate his broad Article II functions and are no less worthy of protection than communications reflecting presidential decision-making and deliberations on other topics. The core of the privilege, after all, is to protect the quality of presidential decision-making—regardless of the topic—by shielding from disclosure the advice that he is given so that those giving advice feel free to speak candidly. *See, e.g.*, *Loving*, 550 F.3d at 37 (stating that the presidential communications privilege "preserves the President's ability to obtain candid and

informed opinions from his advisors and to make decisions confidentially"); *In re Sealed Case*, 121 F.3d at 750 (stating that "the [presidential communications] privilege itself is rooted in the need for confidentiality to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge").

With the benefit of the Court's *in camera* review and the declaration of Richard A. Sauber from the White House Counsel's Office, there is now ample and consistent detail within the record for the Court to find that the Strategic Plan reflects presidential decision-making—indeed, that it was created and used expressly for that purpose—and, therefore, that DOJ properly withheld it under Exemption 5 based upon the presidential communications privilege. *See Aguiar*, 865 F.3d at 734-35.

The White House used the strategic plans submitted by DOJ and other federal agencies to inform its ongoing deliberations about voting-access-related policies and its further deliberations and consultations with agencies about how to address issues related to voting rights. *See* Sauber Decl. ¶¶ 7, 9-10. The White House's purpose in soliciting the strategic plans was to "inform future policy developments on voting access and to assist the Domestic Policy Council in formulating advice to give to the President in this area." *Id.* ¶ 7. This purpose has played out in practice, with the head of the DPC advising the President based on the information in the strategic plans to inform him "on the extent of agency actions and proposals on relevant voting matters and on areas where further Executive Branch action might be needed or considered within the scope of the President's authority." *Id.*

The plans served as just the beginning of "a back-and-forth, iterative process," in which the White House "work[s] with agencies to identify policy priorities and resolve implementation issues." *Id.* ¶ 9; *see, e.g.*, *Readout of Vice President Kamala Harris's Convening With Voting Rights Leaders*, White House (Feb. 27, 2024), https://perma.cc/Q69P-735Y ("announc[ing] new steps that the Biden-Harris Administration is taking to ensure Americans have the information they need to vote," including steps being taken by the Department of Health and Human Services, the Social Security Administration, and the Department of Interior). The plans have been used to brief the head of the DPC to aid in "deci[sions] [regarding] which options to prioritize in implementing the Executive Order." Sauber Decl. ¶ 9. DOJ's Strategic Plan "notes areas where consultation is required among DOJ, the White House Counsel's Office, and the [DPC]. The [DPC] has in fact engaged and will continue to engage, with DOJ on several of the issues and/or policy proposals addressed in the [P]lan." *Id.* ¶ 10. DOJ's Strategic Plan is but "one step in a policy engagement process between the agency and the President's senior White House advisors intended to inform future policymaking by the Administration." *Id.* Thus, the Strategic Plan did not merely serve the purpose of "assuring agency compliance with, and promotion of, the goals of EO 14019." Order at 47. It is, instead, a communication that occurred in the context of President Biden's "performance of . . . responsibilities of his office, and [was] made in the process of shaping policies and making decisions." *Id.* at 33 (quoting *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 447 (1977) (citation omitted)).

13

### d. Intended and actual confidentiality

DOJ's Strategic Plan is also intended to "remain confidential." *Id.* at 41 (quoting *In re Sealed Case*, 121 F.3d at 744). In its prior decision, the Court expressed skepticism on this score, but the Court had only the initial Brinkmann declaration upon which to base its analysis. In this renewed motion, the Court has the benefit of the Sauber declaration from the White House Counsel's Office. Mr. Sauber states that "officials within the White House believed that agencies would not make their strategic plans public," Sauber Decl. ¶ 11, that "[t]he White House has . . . endeavored to maintain the confidentiality of the submitted strategic plans within the Executive Branch," *id.*, and that "[t]he strategic plans are confidential because they were designed to assist the [DPC] in formulating advice to give to the President about voting rights and they include future policy proposals and corresponding policy, legal, and budgetary issues, if any, that necessitate additional deliberations within the Executive Branch," *id.* ¶ 13.

Nothing in the text of EO 14019 suggested that the President intended the strategic plans to be made public. The list of policy topics related to voting rights that EO 14019 asked agencies to consider does not undermine the confidential nature of the Strategic Plan. *See* Order at 42 (stating that "a trier of fact could reasonably find that the President did not believe that the Strategic Plan should remain confidential because the policy prescriptions to be embodied in the Strategic Plan were made public in EO 14019"). EO 14019 did not instruct agencies to implement particular "policy prescriptions," *id.*, but rather, asked agencies to

14

"consider ways to expand citizens' opportunities to register to vote and to obtain information about, and participate in, the electoral process." 86 Fed. Reg. at 13,623, § 3. Although the Order set out a list of topics that agencies should "consider[]" in their evaluation, *id.*, it did not prescribe what actions each agency should propose, nor did it dictate whether they must actually undertake any such actions, *see id.* (describing agency evaluation of ways that it "*can*" rather than *will* take actions to support access to voting and emphasizing agency "consider[ation]") (emphasis added); *see Am. First Legal Found.*, 2023 WL 4581313 at *7 ("[W]ithin this context of on-going executive policymaking, section 3 is more reasonably read as tasking agencies to brainstorm and identify ways that they '*can* promote voter registration and voter participation' with future possible actions, not merely to report on actions already taken."). Indeed, the Order left agencies with a great deal of flexibility in terms of what ideas they proposed within those areas. Put differently, the list of "general topics [in EO 14019 is] not . . . the information that is intended to be kept confidential." Sauber Decl. ¶ 13.

Moreover, unlike other provisions of the EO, Section 3 called not for "publi[cation]" of the strategic plans, but rather submission of those plans to a specified senior White House adviser. 86 Fed. Reg. at 13,625, § 7 (directing the National Institutes of Standards and Technology to conduct particular analyses and then "publish recommendations regarding" its conclusions). The White House subsequently instructed federal agencies to submit those plans via a "secure, online password-protected portal to which only certain White House staff had access."

15

Sauber Decl. ¶ 11. And the White House made clear its expectation that the strategic plans would contain nonpublic information; its interim template directed agencies to describe all "potential agency actions," including those that "reflect ambitious possibilities" that may "require overcoming significant obstacles" before they could be implemented. ECF No. 52-3 (emphasis added). The White House expected that agencies would ultimately take substantive action to implement EO 14019 and that many of those intended actions would be described in the strategic plans. But the fact that federal agencies have ultimately taken substantive actions does not justify or compel the disclosure of "nonpublic presidential communications" between agencies and the White House discussing the possibility of such actions. *Protect Democracy*, 10 F.4th at 885; *see also Am. First Legal Found.*, 2023 WL 4581313, at *9 (upholding the Exemption 5 withholding of agencies' strategic plans submitted pursuant to EO 14019, despite the fact that some of the actions described in the plans had been adopted, because "the strategic plans document information and advice 'given up the chain to someone (the President) who then made a decision.'") (quoting *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 913 F.3d 1106, 1113 (D.C. Cir. 2019)). The public must instead request agency records pertaining to the ultimate policy decisions themselves.

This scenario is readily distinguishable from the scenario in *Center for Effective Government v. United States Department of State*, 7 F. Supp. 3d 16, 26 (D.D.C. 2013), in which the court held that a document was not confidential because a public "fact sheet" "described in detail the goals and initiatives set forth" within the allegedly

confidential document. *See* Order at 42-43. Here, in contrast, there is no "fact sheet" purporting to "describe[] in detail the goals and initiatives set forth" in DOJ's Strategic Plan, much less the undecided-upon policy proposals within the Plan that have not yet come to fruition. *See* Second Brinkmann Decl. ¶ 12. Thus, the contents of DOJ's Strategic Plan remain confidential, as they were always intended to be.

Further, as of the date of his declaration, the White House Counsel's Office declarant, Richard A. Sauber, was not aware of any "federal agency [that] has ever made public the [S]trategic [P]lan that it submitted to the Domestic Policy Council under EO 14019." Sauber Decl. ¶ 14. The Court's prior suggestion that the Department of Defense (DoD) published its strategic plan under EO 141019 relied upon a mistaken premise. *See* Order at 43. DoD's document entitled *Federal Voting Assistance Program Strategic Plan 2021–2025* is not the Strategic Plan that DoD submitted to the White House pursuant to EO 14019. Sauber Decl. ¶ 14. Moreover, the DoD document does not follow the template structure for the strategic plans and existed in an earlier format even before EO 14019 was published. *See id.* Instead, it represents revisions to a pre-existing "strategic plan" that DoD "adjusted" "[i]n response to" many of the goals highlighted in EO 14019. *See* DOD, *Federal Voting Assistance Program Strategic Plan 2021–2025*, at 2, https://perma.cc/UF36-DWZ8. Nowhere within the *Federal Voting Assistance Program Strategic Plan 2021–2025*

does DoD indicate what proposals it intended to or had conveyed to the White House as part of the process prescribed in EO 14019.[3]

### e. Foreseeable harm

Disclosure of DOJ's Strategic Plan would cause specific foreseeable harm, including impairing the ability of the President and his DPC advisors to obtain candid and comprehensive information from agencies regarding potential access-to-voting policies. *See* Brinkmann Decl. ¶¶ 19, 31-32; *see Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*, No. 18-2622 (ABJ), 2021 WL 4502106 at *23 (D.D.C. Sept. 30, 2021) (finding the foreseeable harm standard was satisfied for the presidential communications privilege where the declarant explained that disclosure would "burden[] the ability of the President and his advisors to engage in a confidential and frank decision-making process and chill[] or inhibit[] their ability to have candid discussions, thus impacting the efficiency of government policy-making"). Such disclosure would deter DOJ employees from "providing a full range of options, plans, or propositions for future potential actions out of concern for creating . . . public confusion." Brinkmann Decl. ¶ 20. And such public confusion would result from disclosure of the Strategic Plan because it contains many proposed actions that the public might construe as "future commitments, past actions, or provisions already in place." *Id.*

---

[3] The fact that DoD made public the goals guiding its policy with respect to voting access has no bearing on whether the presidential communications privilege covers the separate set of proposals that DoD and other federal agencies, including DOJ, conveyed confidentially to the White House pursuant to EO 14019.

Because the presidential communications privilege applies to DOJ's Strategic Plan and disclosure of the Plan would cause specific, foreseeable harm, the Court should uphold DOJ's withholding in full of its Strategic Plan under Exemption 5.

## II. DOJ properly withheld portions of its Strategic Plan under FOIA Exemption 5, based upon the deliberative process privilege.

### a. Background law

FOIA Exemption 5 incorporates the deliberative process privilege, which "protects documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Campaign Legal Ctr. v. U.S. Dep't of Just.*, 34 F.4th 14, 19 (D.C. Cir. 2022) (citation omitted); *see Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1281 (11th Cir. 2004). To qualify for protection under this privilege, material must be both pre-decisional and deliberative. *See Miccosukee Tribe*, 516 F.3d at 1263. A document is predecisional if it was "prepared in order to assist an agency decision maker in arriving at his decision." *Id.* (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184 (1975)); *see Moye*, 376 F.3d at 1277 (predecisional documents "may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency") (citations omitted). A document is deliberative if it was "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Miccosukee Tribe*, 516 F.3d at 1263 (citation omitted).

The deliberative process privilege is designed to protect (1) "creative debate and candid consideration of alternatives" within the government, "thereby[] improv[ing] the quality of agency policy decisions;" (2) "the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon," and (3) "the integrity of the decision-making process itself." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982); *see also Moye*, 376 F.3d at 1278. Courts "should be wary of interfering with th[e] process" by which agencies "examin[e] their policies." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975).

### b. Predecisional

This Court previously held that no portion of DOJ's Strategic Plan was exempt from disclosure based upon the deliberative process privilege because, according to the Court's reasoning, the Plan was not predecisional. *See* Order at 32. While DOJ agrees that the Plan represented DOJ's decision about *what ideas to convey* to the White House in response to EO 14019's solicitation of strategic plans from agencies, it respectfully disagrees that this fact necessitates a finding that the Plan is not predecisional. *See* Second Brinkmann Decl. ¶ 12, 12 n.2. The Plan implicates multiple decision-making processes—a separate process for each proposed potential future action—and provides a snapshot in time as to the status of DOJ's consideration of each of those actions. *See id.* The only decision-making processes completed at the time DOJ transmitted the Strategic Plan to the White House were the broad decision of what to include in the Plan and the more specific decisions on

the subset of courses of action to which the Department had committed. Still ongoing were the decision-making processes for each *proposed* potential future course of action that DOJ mentioned in its Strategic Plan. *See id.* And these processes included deliberations both within DOJ and between DOJ and the White House. *See* Sauber Decl. ¶ 9. Thus, while one step of "the process of formulating possible strategies for achieving the goals set out in EO 14019 . . . concluded at the agency" when the Strategic Plan was conveyed to the White House, Order at 32, the Plan did not represent DOJ's operative commitments.

For that reason, DOJ has asserted additional withholdings (that overlap with the withholding-in-full based on the presidential communications privilege) of the portions of the Plan that discuss ideas DOJ was merely considering and presenting to the White House as potential options, not as settled policy, and that DOJ has still not decided upon or implemented. *See, e.g.*, Second Brinkmann Decl. ¶ 12; Brinkmann Decl. ¶ 24; *see also* Sauber Decl. ¶ 10. The portions of the Plan withheld based on the deliberative process privilege include passages "substantively discuss[ing] expectations of then-intended actions, weigh[ing] alternative options without deciding on either option, and consider[ing] potential outcomes, perceived benefits, and possible barriers to implementation of contemplated strategies." Second Brinkmann Decl. ¶ 13.

Because DOJ had not yet made its "final determination" as to how it *would* "effectuate the goals outlined in EO 14019" with respect to the proposed potential future actions that have not yet been decided upon, those proposals are not part of

any "operative plan to promote voter registration and voter participation."  Order at 32 (citation omitted).  There is, therefore, strong "evidence that [elements of] the Strategic Plan [are] not already being applied by DOJ."  *Id.* at 31-32; *see* Second Brinkmann Decl. ¶ 11.  Thus, to the extent that this Court's prior opinion held that proposed DOJ actions discussed in the Strategic Plan were not pre-decisional, DOJ respectfully requests that the Court reconsider that holding, particularly in light of the facts made available to the Court through its *in camera* review and the additional declarations. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of State*, 282 F. Supp. 3d 338, 340 (D.D.C. 2017) (concluding, after conducting *in camera* review of records, that "it [wa]s appropriate to reconsider [the court's] prior ruling," and holding that the withheld material was exempt from disclosure).

> ### c.  Deliberative

The portions of DOJ's Strategic Plan that were withheld based upon the deliberative process privilege reflect the "consultative process that was occurring both within the Department and between the Department and the White House" as to whether to take the proposed policy actions.  Brinkmann Decl. ¶ 24; *see* Second Brinkmann Decl. ¶ 13.  In other words, the Plan is "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters" upon which the agency was still deliberating and has yet to decide upon or implement. *Miccosukee   Tribe*,   516   F.3d   at   1263   (citation   omitted). Moreover, disclosure of these withheld portions of the Plan would "reveal the mental processes of [DOJ's] decisionmakers" as they weighed potential future policy actions

and "would expose [DOJ's] decisionmaking process in such a way as to discourage candid discussion within the agency and, thereby, undermine the agency's ability to perform its functions." *Moye*, 376 F.3d at 1278; *see* Second Brinkmann Decl. ¶ 13.

### d. Foreseeable harm

There is significant foreseeable harm to the release of the limited portions of the Strategic Plan over which DOJ has asserted Exemption 5 based upon the deliberative process privilege. Releasing the predecisional, deliberative information in DOJ's Strategic Plan would harm each of the interests the deliberative process privilege is intended to protect. If ideas for potential future actions submitted confidentially to the White House were made public, DOJ "employees engaging in similar decisionmaking processes in the future would be much more cautious . . . in providing all pertinent information and viewpoints to . . . [White House] decisionmakers in an open and timely manner." Brinkmann Decl. ¶ 31. Release of such information would "damage[]" "[t]he quality of the agency decisionmaking process" and force agency employees to "evaluate advice and information [sent confidentially to the White House] through the lens of a potential public release" rather than focusing on providing comprehensive advice unfettered by concerns of future publicity. *Id.* Such reticence would, in turn, hinder "the President's ability to receive candid and informed opinions," particularly "in the context of voting access issues which. . . are currently a matter of considerable national controversy and concern." *Id.* ¶ 32.

Release of the predecisional and deliberative portions of DOJ's Strategic Plan would also cause public confusion. *See id.* ¶ 33. Members of the public may find it difficult to distinguish between aspects of the Plan that represent actual DOJ policy and aspects that relate to proposals that were never adopted. *See* Second Brinkmann Decl. ¶¶ 17-18. That concern may be heightened by this Court's prior statement in a publicly available order that the Strategic Plan "appears to be in effect as the DOJ's operative plan." Order at 32. As discussed, DOJ has *not* committed itself to undertaking all of the proposed actions described in the Plan, and while some of the proposals have since been decided upon and implemented, others have not.

Because portions of DOJ's Strategic Plan represent merely proposed potential actions that the Department had not decided upon and still has not decided upon or has ultimately rejected, DOJ respectfully requests that—if necessary—the Court reconsider its prior holding that no portion of the Strategic Plan is predecisional.

As discussed above, the Strategic Plan is protected from disclosure in its entirety under the presidential communications privilege, and this Court thus need not reach the deliberative process privilege. But, should it prove necessary to reach the issue, the Court should hold that the portions of the Plan over which DOJ withheld information based on the deliberative process privilege—the proposed actions which have not yet been implemented—were properly withheld under Exemption 5.

## CONCLUSION

For the foregoing reasons, this Court should uphold DOJ's assertion of Exemption 5 over the challenged withholding and grant DOJ's motion for summary judgment.

Dated: March 25, 2024                    Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          Principal Deputy Assistant Attorney General
                                          Civil Division

                                          ELIZABETH J. SHAPIRO
                                          Deputy Branch Director

                                          */s/   Laurel H. Lum*
                                          LAUREL H. LUM
                                          Trial Attorney (NY Bar No. 5729728)
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L St NW
                                          Washington, D.C. 20005
                                          Telephone: (202) 305-8177
                                          Email: laurel.h.lum@usdoj.gov
                                          *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2024, I filed the foregoing via the CM/ECF

system, which will send a Notification of Electronic Filing to:

> **Jeffrey M. Harris**
> **Frank H. Chang**
> Consovoy McCarthy PLLC
> 1600 Wilson Blvd. Suite 700
> Arlington, VA 22209
> (202) 321-4120
> (703) 243-9423
> (727) 504-8994
> jeff@consovoymccarthy.com
> frank@consovoymccarthy.com


<u>/s/ *Laurel H. Lum*</u>
LAUREL H. LUM
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Phone: 202-305-8177
Email:  laurel.h.lum@usdoj.gov