UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THE FOUNDATION FOR
GOVERNMENT ACCOUNTABILITY,

    Plaintiff,

v.                                                     Case No.: 2:22-cv-00252-JLB-KCD

U.S. DEPARTMENT OF JUSTICE,

    Defendant.
_____/

## **ORDER**

       This case concerns the Foundation for Government Accountability's ("FGA") Freedom of Information Act ("FOIA") request to Defendant, United States Department of Justice ("DOJ"), for documents related to Executive Order 14019 ("EO 14019"). This Court's previous order (Doc. 67) on DOJ's Motion for Summary Judgment (Doc. 50) and FGA's Cross-Motion for Summary Judgment and, Alternatively, for *In Camera* Inspection (Doc. 52), directed DOJ to produce certain withheld documents to the Court for its *in camera* review. (*See* Doc. 67 at 49). The Court has completed its *in camera* review of the withheld documents and has carefully considered DOJ's Renewed Motion for Summary Judgment, FGA's opposition to the same, and the entire summary judgment record. (Docs. 74, 75,

76).[1] After careful review of the facts in the light most favorable to FGA, the Court grants DOJ's Renewed Motion for Summary Judgment (Doc. 74) and denies FGA's Renewed Cross-Motion for Summary Judgment (Doc. 75).

## BACKGROUND

The Court recited the background of this case in its previous summary judgment order and fully incorporates that order herein. (*See* Doc. 67 at 2–9).[2] Briefly, this Court found that genuine issues of material fact precluded summary judgment as to DOJ's invocation of privilege over three documents listed on DOJ's *Vaughn*[3] Index entries 53 and 71,[4] and the DOJ Strategic Plan (the "withheld documents"). (Doc. 67 at 2, 50). The Court ordered DOJ to produce copies of the withheld documents for the Court's *in camera* review so that the Court could determine whether entries 53 and 71 were appropriately withheld based on the

---

[1] The Court also considered the supplemental affidavit filed by DOJ and FGA's response to it (Doc. 68-1; Doc. 72), and FGA's Notice of Supplemental Authority (Doc. 77) and DOJ's response to the same (Doc. 78).

[2] To the extent any conflict between the Court's first summary judgment order, (Doc. 67), and this Order exists, this Order shall control.

[3] When a governmental agency asserts a FOIA exemption to avoid disclosure of certain documents, the agency must produce a "*Vaughn* Index," which describes each document withheld or redacted and provides an explanation of the reasons for non-disclosure. *See Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973) (creating a "system of itemizing and indexing" that requires agencies invoking FOIA exemptions to "correlate statements made in the . . . refusal justification with the actual portions of the document").

[4] *Vaughn* Index entry 71 is "duplicative of" entry 53. (Doc. 67 at 21–22).

2

deliberative process privilege and whether the DOJ Strategic Plan was properly withheld based on the presidential communications privilege. (*Id*.).

DOJ filed the withheld documents under seal for this Court's *in camera* review. (Doc. 70). At the same time, DOJ filed the Declaration of Richard A. Sauber (the "Sauber Declaration"), which described the purpose and use of the many strategic plans created by executive agencies. (Doc. 68-1).

The Sauber Declaration explained that the President solicited the Strategic Plan in furtherance of one of his "top domestic priorities"—"promoting access to voting." (*Id*. at ¶¶ 5–7). In practice, "strategic plans were submitted [by executive agencies] to the White House and reviewed by members of the Domestic Policy Council who compiled information from the [strategic plans] for the head of the Domestic Policy Council to brief the President." (*Id*. at ¶ 7).

The contents of all strategic plans, including the DOJ Strategic Plan subject to this litigation, "informed the President on the extent of agency actions and proposals on relevant voting matters and on areas where further Executive Branch action might be needed or considered within the scope of the President's authority." (*Id*.). The Sauber Declaration characterizes the strategic plans as one step in an "iterative process" between executive agencies and the White House, emphasizing that "[n]ot all of [the strategic plans] have come to fruition, and many may never be implemented" due to various "implementation issues." (*Id*. at ¶¶ 8–9). Further, the Sauber Declaration specifies that "[t]he DOJ Plan, like other agency plans, . . . does not represent the conclusion of the agency's efforts but rather only one step in a

policy engagement process between the agency and the President's senior White House advisers intended to inform future policymaking by the Administration." (*Id.* at ¶ 10).

According to the Sauber Declaration, the DOJ Strategic Plan was submitted to the White House with the "expectation of confidentiality" because EO 14019 did *not* ask DOJ—or any other executive agency—to make its Strategic Plan public and instead called for it to be submitted directly to the Assistant to the President for Domestic Policy. (*Id.* at ¶¶ 11–12).[5] The Sauber Declaration further explains that the strategic plans are confidential because "they include future policy proposals and corresponding policy, legal, and budgetary issues, if any, that necessitate additional deliberations within the Executive Branch." (*Id.* at ¶ 13).[6] FGA contends that the DOJ Strategic Plan was not confidential because there was no record of confidentiality prior to this suit. (Doc. 75 at 4, 18). Moreover, other agencies, such as the Pension Benefit Guaranty Corporation, have already publicly released their plans without White House authorization. (*See* Doc. 77 at 1).

Upon completion of the Court's *in camera* review of the withheld documents, the Court granted leave for DOJ to file a second motion for summary judgment.

---

[5] The DOJ Strategic Plan reviewed *in camera* by the Court is an example of a strategic plan generated by executive agencies pursuant to EO 14019. (Doc. 68-1 at ¶ 10).

[6] DOJ also points out that "[t]he White House has . . . endeavored to maintain the confidentiality of [the strategic plans] within the Executive Branch" by utilizing password-protected technology, which prevented it from being shared with other agencies. (Doc. 68-1 at ¶ 11).

4

(Doc. 73).  Along with its Renewed Motion for Summary Judgment (Doc. 74), DOJ submitted the Second Declaration of Vanessa R. Brinkmann (the "Second Brinkmann Declaration").  (Doc. 74-1).

According to the Second Brinkmann Declaration, because the withheld portions of the DOJ Strategic Plan "essentially [represent] a snapshot in time that includes some proposed future actions that were implemented after the plan was submitted to the White House, and others that were never implemented," releasing the DOJ Strategic Plan may result in foreseeable harm in the form of public confusion about "which proposed future actions became operative and which did not."  (*Id.* at ¶ 14).

## DISCUSSION

### I. FOIA Disclosure Standards.

FOIA cases are generally handled on motions for summary judgment once the documents in dispute are properly identified. *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Miscavige v. I.R.S.*, 2 F.3d 366, 369 (11th Cir. 1993)).  "Summary judgment is appropriate if the pleadings, depositions, admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Miccosukee*, 516 F.3d at 1243 (citing Fed. R. Civ. P. 56(c)).

In a FOIA case, "[t]he agency bears the burden to demonstrate that its records search was adequate and it properly withheld information." *Jimenez v.*

5

*Dep't of Homeland Sec.*, 119 F.4th 892, 899 (11th Cir. 2024) (citations omitted). Similarly, "the 'burden is on the agency' to show that requested material falls within a FOIA exemption." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (quoting 5 U.S.C. § 552(a)(4)(B) and citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).

The Eleventh Circuit has instructed that this Court must have "an adequate factual basis to render" its decision on whether the government has met its burden to establish the exemption it asserted. *See Broward Bulldog, Inc. v. U.S. Dep't of Justice*, 939 F.3d 1164, 1176 (11th Cir. 2019). "An agency may rely on affidavits or declarations . . . to meet its burden 'so long as they provide an adequate factual basis for the district court to render a decision.'" *Jimenez*, 119 F.4th at 899 (quoting *Miccosukee Tribe*, 516 F.3d at 1258–59). Indeed, an adequate factual basis can be provided by a *Vaughn* index, declarations, *in-camera* review, or a combination of these methods. *See id.* at 899–900 (citing *Miccosukee*, 516 F.3d at 1258–59).

The Eleventh Circuit has explained that the agency "may meet this burden by producing affidavits of responsible officials so long as the affidavits are relatively detailed, nonconclusory, and submitted in good faith." *Broward Bulldog*, 939 F.3d at 1176 (quotation and citation omitted); *Miscavige*, 2 F.3d at 368 (explaining "that in certain cases, affidavits can be sufficient for summary judgment purposes in a FOIA case if they provide as accurate a basis for decision as would sanitized indexing, random or representative sampling, *in camera* review, or oral testimony") (citing *U.S. Dep't of Justice v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749

(1989)). Such agency affidavits are entitled to a presumption of good faith. *Jimenez*, 119 F.4th at 900 (citations omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007).

## II. General Principles of FOIA's Exemption 5.

FOIA Exemption 5 protects from disclosure of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency. . . ." 5 U.S.C. § 552(b)(5). "One of the privileges incorporated into Exemption 5 is the common-law 'privilege regarding the government's deliberative process.'" *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005) (quoting *Bureau of Nat'l Affairs v. Dep't of Justice*, 742 F.2d 1484, 1496 (D.C. Cir. 1984)). "To come within the purpose of the privilege. . . [withheld] document[s] must be both 'pre-decisional' and 'deliberative.'" *Id.* (citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)). Documents are pre-decisional when they are "prepared in order to assist an agency decision maker in arriving at his decision." *Miccosukee*, 516 F.3d at 1263; *cf. Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1277 (11th Cir. 2004) (explaining that "a 'predecisional' document is one prepared in order to assist an agency decision-maker in arriving at his decision and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" (citation omitted)). Documents are deliberative if they are a direct part

7

of the deliberative process in that they make recommendations or express opinions on legal or policy matters. *Id.* Exemption 5 includes documents prepared by agency officials that are used to advise the President, among other government officials. *Jud. Watch,* 412 F.3d at 129–30.

In addition to the withholder demonstrating that a withheld document falls under a FOIA exception, the plain text of the FOIA statute explains that the withholding governmental agency shall withhold that document only if, among other requirements, it "reasonably foresees that disclosure [of the document] would harm an interest protected by an exemption," or that "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i)(I)–(II).

### III. *Vaughn* Index Entries 53 & 71 are protected under Exemption 5's deliberate process privilege.

As noted, this Court ordered *in camera* review of entries 53 and 71 of DOJ's *Vaughn* Index because it could not determine as a matter of law if the notes were properly withheld under Exemption 5's deliberative process privilege simply by reviewing the *Vaughn* Index and the declarations submitted by DOJ. (Doc. 67 at 22–23). That is, the Court was unable to determine whether the documents were "a direct part of the deliberative process in that [they] [made] recommendations or expresse[d] opinions on legal or policy matters." *Miccosukee*, 516 F.3d at 1263 (citations omitted).

After this Court's careful *in camera* review of the documents listed as entries 53 and 71, it finds that entries 53 and 71 fall within Exemption 5's deliberative process privilege. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532

8

U.S. 1, 8 (2001). First, it is clear that entries 53 and 71 do not constitute a verbatim transcript of that meeting. *See Abramyan v. United States Dep't of Homeland Sec.*, 6 F. Supp. 3d 57, 65 (D.D.C. 2013) (noting that a "verbatim transcript" of an interview would not be deliberative). Instead, entries 53 and 71 are a compilation of fragmented notes taken by a DOJ employee that memorializes a July 12, 2021, listening session involving the sharing of ideas and potential strategies with White House and other executive branch officials by several stakeholders, such as various voting rights advocates, to inform Executive Branch deliberations on compliance with Executive Order 14019. (Doc. 50-3 at 10–11; Doc. 70-2 at 2–7).

The Court also finds that nothing in these notes indicates anything more than blurbs jotted down by an executive official as he or she listened to stakeholder comments suggesting potential ways the executive agencies subject to Executive Order 14019 *could* implement policies to increase voter registration and participation. *See Moye*, 376 F.3d at 1277 (explaining that the purpose of Exemption 5's "deliberative process privilege" is to "allow agencies to freely explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny" (citation omitted)). This finding of fact supports the Court's conclusion that entries 53 and 71 represented an engagement in the pre-decisional deliberative process, which is covered under Exemption 5's deliberative process privilege. *See id.*; *cf. Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513–14 (D.C. Cir. 2011) (finding that where factual summaries were "culled" from a "much larger universe of facts . . . and reflect[ed] an 'exercise of judgment as

to what issues are most relevant to the pre-decisional findings[,]'" such factual summaries "reflect[ed] [the] pre-decisional deliberative process").[7]

The Court therefore grants summary judgment to DOJ with respect to *Vaughn Index* entries 53 and 71.

### IV. The DOJ Strategic Plan identified in the *Vaughn* Index is exempted from disclosure.

The Court also previously held that there was a genuine dispute of material fact as to whether the presidential communications privilege applies to the DOJ's Strategic Plan and ordered *an in camera* review of that document as well. (Doc. 67 at 33–49).

The presidential communications privilege "applies to 'documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential.'" *Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 885 (D.C. Cir. 2021) (quoting *In re Sealed Case*, 121 F.3d at 744). Here, the Court was initially unable to determine whether the DOJ Strategic Plan reflected presidential decisionmaking and deliberations. (Doc. 67 at 36–41). Specifically, DOJ's *Vaughn* Index description did not adequately explain

---

[7] The Court further agrees with DOJ and finds that the disclosure of these notes would create foreseeable harm by undermining the willingness of DOJ employees to take substantive notes at future listening sessions. (*See* Doc. 50-2 at ¶ 40); *Klamath*, 532 U.S. at 8–9 (finding that officials will likely "not communicate candidly among themselves if each remark is a potential item of discovery and front page news"). Accordingly, the Court concludes that the DOJ properly withheld/heavily redacted the document comprising entries 53 and 71 based on Exemption 5s deliberative process privilege. *See Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 885 (D.C. Cir. 2021); 5 U.S.C. § 552(b)(5).

how the Strategic Plan was connected to any clear decisions to be made by the President and how those decisions were related to the President's duties.[8] (*Id.*).

In all events, the Court first turns to FGA's assertion that the presidential privilege as to DOJ's Strategic Plan has been waived through the publication of "Fact Sheets" or strategic plans by executive agencies. *See In re Sealed Case*, 121 F.3d at 740 ("[I]f we find that waiver has occurred, we need not proceed further."). In *In re Sealed Case*, the White House released the White House Counsel's final report but did not release the documents utilized to generate the final report. *Id.* at 741–42. The White House did not explicitly declare that they would waive any claims of privilege that may apply. *Id.* And the White House did not invoke its privilege until after the suit was filed. *Id.* at 742. In determining whether the White House waived its privilege, the court held that the release of the final report did not waive the privilege in regard to the documents utilized to prepare the final

---

[8] While the Court remains somewhat skeptical that the DOJ Strategic Plan solely addressing voter registration and participation implicates an Article II power, some courts suggest that "the presidential communications privilege is not *only* available when the underlying decision flows from inherent Article II power." *Cause of Action Inst. v. U.S. Dep't of Com.*, No. 19-CV-2698, 2022 WL 4130813, at *6 (D.D.C. Sept. 12, 2022) (emphasis in original). "Because the President must 'take care that the laws be faithfully executed,' U.S. CONST. ART. II, including laws that do not implicate a core Article II power, such a rule would inevitably work to deprive the President of candid advice and criticism when faithfully executing some laws but permit it when taking care to implement others." *Id.* (citation omitted); *Protect Democracy Project, Inc.*, 10 F.4th at 885 (finding that the presidential communications privilege is "limited to communications 'in performance of (a President's) responsibilities', 'of his office,' and made 'in the process of shaping policies and making decisions'") (citing *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977)).

11

report. *Id.* at 741. The court reasoned that none of the withheld documents were identical to the final report that was published.[9] *Id.* at 742.

Here, the DOJ refutes FGA's position that the release of other executive agencies' respective fact sheets and strategic plans waives the presidential communications privilege regarding the DOJ Strategic Plan. The Court respectfully disagrees with FGA's position. First, just as the White House in *In re Sealed Case* did not explicitly declare that it would waive executive privilege, the White House here did not authorize the release of any agency's fact sheets or strategic plans. *In re Sealed Case*, 121 F.3d at 740; (Doc. 76 at 6). Second, like the White House in *In re Sealed Case* did not invoke its privilege until it was subpoenaed, DOJ did not invoke its privilege until after the suit was filed here. *Id.* at 740; (Doc. 50 at 13-24). Finally, like the *In re Sealed Case* court's refusal to extend the all-or-nothing approach to executive privileges, this Court holds that the release of a fact sheet or other executive agencies' strategic plans does not constitute a waiver of the presidential communications privilege in regard to the DOJ Strategic Plan. *Id.* at 741-42. Thus, the presidential communications privilege has not been waived for all the reasons stated above.

---

[9] While voluntary disclosure of privileged material in an attorney-client context waives the privilege to all other communications related to the same subject matter, the court in *In re Sealed Case* refused to extend this all-or-nothing approach to executive privileges to incentivize nondisclosure of some privileged material "out of fear that by doing so they are exposing other, more sensitive documents." *In re Sealed Case*, 121 F.3d at 741.

12

Having determined that the presidential communications privilege has not been waived, the Court addresses the remainder of FGA's arguments. FGA contends that the presidential communications privilege does not apply because (1) President Biden has not *personally* invoked this privilege, (2) the DOJ Strategic Plan reflects DOJ's decisionmaking, not the President's deliberations, and (3) DOJ could not satisfy the FOIA foreseeable-harm standard. (*See* Doc. 75 at 14).

First, FGA argues that DOJ cannot withhold its Strategic Plan based on the presidential communications privilege because the President has not personally invoked the privilege. (*Id.* at 14–16). This Court disagrees and holds that the President's personal invocation is not required in the context of FOIA requests. *See Cause of Action Inst.*, 2022 WL 4130813, at *5 (citations omitted) ("[T]he President himself need not invoke the privilege; instead, an agency may invoke the presidential communications privilege if it makes a finding that the privilege applies to a requested document."); *Am. Ctr. for Law & Just. v. Dep't of State*, 330 F. Supp. 3d 293, 308 (D.D.C. 2018) ("[E]ven assuming that the President must personally invoke the presidential communications privilege in civil discovery, the Court concludes that this requirement is not imported into the far different context of FOIA.") (citation and internal quotation marks omitted)); *e.g. Elec. Priv. Info. Ctr. v. Dep't of Just.*, 584 F. Supp. 2d 65, 80 (D.D.C. 2008) (noting that "the presidential communications privilege does not need to be invoked by the President himself").

Instead, the relevant inquiry is whether the communications in dispute were authored or, solicited and received, by the President's key advisors or staff

13

responsible for formulating advice to the President. *In re Sealed Case*, 121 F.3d at 752. As the Sauber Declaration explains, the DOJ Strategic Plan was solicited through EO 14019 so that the President could make decisions to inform future policy developments on voting access. (Doc. 68-1 at ¶ 7); *see Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 36, 48 (D.D.C. 2007) (holding that communications "requested and received by, the President's immediate White House advisers, and their staffs, who were formally charged with . . . providing him recommendations" for how to support requests for assistance were properly withheld under the presidential communications privilege).

Next, FGA argues that the DOJ Strategic Plan reflects DOJ's decisionmaking, not President Biden's, and that EO 14019 asked DOJ to identify the ways *it* could promote voter registration and participation. (Doc. 75 at 16–19). The Court disagrees. The Court finds DOJ has submitted sufficient evidence that the strategic plans created pursuant to EO 14019 were submitted as part of a "back-and-forth, iterative" policy-making process between the White House and DOJ concerning access to voting. (Doc. 68-1 at ¶¶ 7, 9–10). Even more critically, DOJ has submitted evidence that the DOJ Strategic Plan informed the President on areas where "Executive Branch action might be needed or considered within the scope of the President's authority." (Doc. 68-1 at ¶ 7). This is important because it demonstrates that the DOJ Strategic Plan was intended to put forth proposals that "ultimately [called] for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752 (stating that the "presidential communications privilege should

14

never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President"). Because DOJ has provided sufficient evidence that the DOJ Strategic Plan called for the President to make decisions related to these topics, it finds that it reflected presidential decisionmaking.

Turning to the issue of confidentiality, the Court was initially unable to determine if the DOJ Strategic Plan was entitled to the presidential communications privilege because, at the time of DOJ's first motion for summary judgment, DOJ had not presented evidence that the DOJ Strategic Plan is confidential or that the President believes it should remain confidential. (Doc. 67 at 41–44). DOJ has supplemented the record by clarifying this issue through the Sauber Declaration, which states that the White House believed the agencies would not make their strategic plans public. (Doc. 68-1 at ¶¶ 11–12). In support of that contention, the Sauber Declaration points out that EO 14019 required executive agencies to submit—not publish—strategic plans, and, to Sauber's knowledge, no federal agency ever made their proposals public. (*Id*. at ¶¶ 12–14). Moreover, there is sufficient record evidence that the White House endeavored to keep the DOJ Strategic Plan private by using a "secure, online password-protected portal" for submission. (Doc. 68-1 at ¶ 11). The Court finds no record evidence that the DOJ Strategic Plan was shared widely or disseminated to staffers who served in non-

15

advisory roles.[10]  As such, the Court is satisfied that the DOJ Strategic Plan was treated as a confidential document.

Finally, the Court also agrees with DOJ that it has made a sufficient showing of foreseeable harm to have withheld the DOJ Strategic Plan under the presidential communications privilege.  Courts consistently note the potential chilling effects on confidential and candid presidential decisionmaking as sufficient identification of foreseeable harm should certain documents be publicly disclosed.  *See Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*, No. 18-cv-2622, 2021 WL 4502106, at *23 (D.D.C. Sept. 20, 2021) (citing *Leopold v. U.S. Dep't of Justice*, 487 F. Supp. 3d 1, 10 n.4 (D.D.C. 2020)).  Here, DOJ has carried its burden through the submission of two declarations from Senior Counsel Vanessa Brinkmann.  (Doc. 50-4; Doc. 74-1).  Brinkmann's First Declaration states that "there is reasonably foreseeable harm in the release of the DOJ Strategic Plan, given the detriment to

---

[10] In its Notice of Supplemental Authority, FGA points out that the Peace Corps and the Pension Benefit Guaranty Corporation have recently provided copies of their strategic plans in response to FOIA requests, effectively waiving the privilege to all strategic plans developed pursuant to EO 14019. (Doc. 77 at 1).  The Court finds this argument unpersuasive.  The release of those documents by those two executive agencies does not waive privilege over other documents, even when those documents are related.  *See, e.g., Protect Democracy Project, Inc.*, 10 F.4th at 891 (citing *In re Sealed Case*, 121 F.3d at 809).  Indeed, "[s]ince executive privilege exists to aid the governmental decisionmaking process, a waiver should not be lightly inferred."  *Id.* at 890 (quoting *In re Sealed Case*, 121 F.4th at 741 (citation omitted)). Here, the fact that the Peace Corps and the Pension Benefit Guarantee Corporation released their respective strategic plans does not undermine DOJ's contention that the White House treated all strategic plans as confidential documents, including DOJ's Strategic Plan.  Moreover, DOJ has provided sufficient evidence that the Peace Corps and Pension Benefit Guaranty Corporation's strategic plans were released *outside any authorization* from the White House.  (Doc. 78-1 at ¶ 8).

White House and inter-agency collaboration and decisionmaking that would result if it were to be disclosed." (Doc. 50-4 at ¶ 18).  Brinkmann declares as follows:

> The release of privileged communications between DOJ and White House personnel would impose a significant chilling effect on presidential decisionmaking, as it would hinder the ability of the President and senior presidential advisors to obtain frank, unfettered information and advice from the Department and other Executive Branch agencies on an important policy issue such as voting access.  The quality of the presidential decisionmaking process would be damaged if DOJ employees cannot focus solely on providing comprehensive and candid information to the White House, but rather must evaluate advice and information through the lens of potential public release.

(*Id.*).  The Second Brinkmann Declaration also identifies another foreseeable harm: public confusion could arise if the Strategic Plan were released regarding "which proposed future actions became operative and which did not." (Doc. 74-1 at ¶ 14). The Court finds that these statements of foreseeable harm are sufficient.

### V. The DOJ Strategic Plan is not a secret law.

FGA also argues that the Strategic Plan falls outside Exemption 5's protections because it constitutes "secret law." (Doc. 75 at 7–11).  The Court previously rejected this argument (Doc. 67 at 27–29) and does so again here.  The evidence produced by DOJ establishes that the Strategic Plan is not "secret law." Instead, the Strategic Plan "is essentially a snapshot in time that includes some proposed future actions that were implemented after the plan was submitted to the White House, and others that were never implemented." (Doc. 74-1 at ¶ 14). Therefore, the Strategic Plan cannot be "secret law" because it does not "embody the agency's effective law and policy. . . ." *See Nat'l Lab. Rels. Bd. v. Sears, Roebuck &*

17

*Co.*, 421 U.S. 132, 153 (1975). And, as DOJ correctly points out, the policy it ultimately adopted and implemented is far from secret as it is publicly available on the internet. *See* VOTING AND ELECTIONS, https://www.justice.gov/voting (last visited Dec. 13, 2024).

Accordingly, the Court holds that DOJ has carried its burden to have withheld its Strategic Plan. Therefore, the Court grants summary judgment with respect to the DOJ Strategic Plan.

## CONCLUSION

For the reasons set forth above, Defendant's Renewed Motion for Summary Judgment (Doc. 74) is **GRANTED,** and FGA's Renewed Cross-Motion for Summary Judgment (Doc. 75) is **DENIED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly, terminate all deadlines, and close the case.

**ORDERED** at Fort Myers, Florida, on December 13, 2024.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE